[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10575

_____

GEORGE TERSHAKOVEC,
DIANA TERSHAKOVEC,
JACQUES RIMOKH,
HERBERT ALLEY,
individually and on behalf of all others similarly situated,
MICHAEL DELAGARZA, et al.,

Plaintiffs-Appellees,

*versus*

FORD MOTOR COMPANY, INC.,

Defendant-Appellant.

_____

2                    Opinion of the Court                    22-10575

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:17-cv-21087-FAM

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Ford Motor Company advertised its Shelby GT350 Mustang as "track ready." But some Shelby models weren't equipped for long track runs, and when the cars overheated, they would rapidly decelerate. A group of Shelby owners sued Ford on various state-law fraud theories and sought class certification, which the district court granted in substantial part. Ford challenges class certification on the ground that proving each plaintiff's reliance on the alleged misinformation requires individualized proof and, therefore, that common questions don't "predominate" within the meaning of Federal Rule of Civil Procedure 23(b)(3).

For reasons we will explain, the predominance inquiry turns on the specifics of the state laws under which plaintiffs have sued—and, in particular, on (1) whether those laws require proof of reliance, (2) if so, whether they permit reliance to be presumed, and (3) if so, under what circumstances. Having considered those questions, we hold that some of plaintiffs' claims may be certified for class treatment, that others may not, and that some require the district court to take a closer look at applicable state-law requirements.

# I

## A

The putative class representatives hail from seven states—California, Florida, Missouri, New York, Tennessee, Texas, and Washington.  Each purchased one of two models of Ford's Shelby GT350 Mustang.

The Shelby is an upgrade of the standard Mustang and, importantly here, was advertised as "an all-day track car that's also street legal."[1]  Track-capability refers to the vehicle's capacity to perform at higher-than-normal speeds in a controlled environment—like, say, on a racetrack.  Track-readiness was a central theme in Ford's Shelby advertising.  For example, in a race-day invitation to Shelby owners, Ford's marketing manager touted the Shelby's "exceptional racetrack capabilities" and said that he was "sure" they were "one of the reasons you purchased your GT350—perhaps the main reason."  Other Shelby ads included descriptions like "track capable," "track ready," and "tested endlessly on the most challenging roads and tracks in the world," as well as statements like, "[W]e wanted to build the best possible Mustang for the places we most love to drive—challenging back roads with a variety of corners and elevation changes—and the track on weekends."

---

[1] The designer for whom the Shelby was named, Carroll Shelby, was portrayed by Matt Damon in the 2019 blockbuster *Ford v. Ferrari*.  FORD V. FERRARI (Twentieth Century Fox 2019).

The Shelby comes in five trims. Plaintiffs are purchasers of the "Base" and "Technology" trims. Those trims lack "transmission and differential coolers," a feature—originally included as standard on all Shelbys—that is designed to prevent engine overheating. Without these coolers, the Shelbys compensate at high RPMs by reverting to "limp mode," a self-preservation status that reduces the vehicle's power, speed, and performance to avoid engine damage. "Limp mode" presents a problem for car enthusiasts who want to take Ford up on its promise of "track capab[ility]."

One way that Shelby owners indulge their need for speed is by participating in "Track Days," organized events at which drivers can take their Shelbys around controlled racetracks at triple-digit clips. According to some plaintiffs, though, "limp mode" set in after six or seven laps—about ten minutes of track time—resulting in rapid deceleration and rendering the vehicles "essentially unusable for sustained track driving," which, they say, was "the main reason many [of them] bought the car."

## B

Plaintiffs filed this putative class action alleging, among other things, common-law fraud claims and state-specific statutory violations. Plaintiffs alleged that Ford falsely advertised all Shelbys as being track-capable, that those representations induced them to buy Shelbys, but that their Shelbys couldn't perform as billed.

Following discovery and a hearing, the district court granted plaintiffs' request for class certification. In particular, the court chose to create multiple state-law classes within a single class-

action case. Although it acknowledged that, as thus structured, the case "look[ed] more like a Multi-District Litigation than a standard class action," the court thought that this framework would "avoid the choice of law issues concomitant with a proposed nationwide class (an issue that would almost certainly defeat [Rule 23(b)(3)] predominance)." The district court separately dismissed Ford's concerns about "the . . . difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), on the grounds that the proposed classes were "small enough" and that variations among state laws could be addressed through "appropriate jury instructions" and "multiple verdict forms that tick[ed] through the elements of the nine certi-fied state class[es'] statutory and common law fraud claims."

    The district court certified classes of plaintiffs whose claims arose under the common and/or statutory law of California, Flor-ida, Illinois, Missouri, New York, Oregon, Tennessee, Texas, and Washington.[2] The district court also certified two classes—one in California and another in Texas—stemming from alleged breaches of implied warranties and violations of the Magnuson-Moss War-ranty Act, 15 U.S.C. § 2301 *et seq.* On appeal, twelve separate claims

---

[2] Each class consisted of "[a]ll persons who purchased a Class Vehicle from a Ford-authorized dealer or distributor located in [insert state here] before April [27], 2016." Doc. 231 at 28; *see also Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2021 WL 3711444, at *1 (S.D. Fla. Aug. 20, 2021) (amending the "class certification order to reflect a class cut-off date of April 27, 2016" instead of April 1). The "Class Vehicles" cover Ford's Shelby GT350 Base and Technol-ogy trims purchased during the relevant period. Plaintiffs estimate that there are 1,668 Class Vehicles nationwide.

remain, arising under the laws of seven states:  California, Florida, Missouri, New York, Tennessee, Texas, and Washington.[3]

We granted Ford's Rule 23(f) petition to appeal the district court's class-certification order.

## II

We review a district court's decision granting or denying class certification for abuse of discretion.  *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1253 (11th Cir. 2014).  The district court abuses its discretion if it "applies the wrong legal standard, follows improper procedures in making its determination, bases its decision on clearly erroneous findings of fact, or applies the law in an unreasonable or incorrect manner."  *Id.*  At the class-certification stage, "the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

## III

Federal Rule of Civil Procedure 23 governs class actions.  In addition to satisfying Rule 23(a)'s four familiar "[p]rerequisites"— numerosity, commonality, typicality, and adequacy of representation—a proposed class must fit within one of the three "[t]ypes" specified in Rule 23(b).  Plaintiffs here sought class certification

---

[3] Plaintiffs are no longer pursuing their claims under Oregon and Illinois law.

under Rule 23(b)(3), which requires both that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

We must decide whether plaintiffs' proposed class satisfies Rule 23(b)(3)'s requirements. We'll consider in turn 23(b)(3)'s two prongs—predominance and superiority, the latter of which entails an inquiry into a class action's manageability.

## A

First, predominance. Common questions "predominate" within the meaning of Rule 23(b)(3) when the substance and quantity of evidence necessary to prove the class claims won't vary significantly from one plaintiff to another. *See Brown v. Electrolux Homes Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016). The first step in assessing predominance is to "identify the parties' claims and defenses and their elements" and to categorize "these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Id.* A common issue is one that will likely be proved using the same evidence for all class members; an individualized issue, by contrast, is one that will likely be proved using evidence that "var[ies] from member to member." *Id.* (citation and internal quotation marks omitted).

In general, a fraud-related claim comprises the following elements: a misrepresentation or omission, materiality, reliance, causation, and injury. *See* Restatement (Second) of Torts §§ 525, 550

8                    Opinion of the Court                    22-10575

(Am. L. Inst. 1977); W. Prosser, The Law of Torts §§ 108, 110, at 714, 731–32 (4th ed. 1971). The parties vigorously dispute whether the reliance element—that is, the question whether Shelby owners relied on, and were induced to buy their cars based on, Ford's advertisements—is capable of class-wide proof or whether reliance issues are instead inherently individualized. Because the parties focus only on the reliance element, so do we.[4]

In granting class certification over Ford's objection that the issues pertaining to plaintiffs' reliance were too individualized, the

_____

[4] Our dissenting colleague disagrees that we can focus solely on reliance because he views two traditionally separate elements—reliance and causation—as inextricably intertwined. *See* Dissenting Op. at 32 ("[C]ausation inherently requires reliance."). Respectfully, we think that conflation overlooks relevant state law. As explained below, *see infra* at 16–20, each of the states whose class certification the dissent disputes expressly distinguishes the two elements. *See, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983, 986 (11th Cir. 2016) (Florida) (holding that plaintiffs "need not show actual reliance on the representation or omission at issue," even when causation is an element); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) (Missouri) (holding that a claim under the Missouri Merchandising Practices Act "expressly does not" require proof of reliance, though it does require causation); *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 592 (Wash. 2015) (Washington) (rejecting "the principle that reliance is necessarily an element of" a consumer-fraud claim, even when causation is); *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000)) (New York) (holding that statutory consumer-fraud claims do "not require proof of actual reliance," but do require causation); *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020) (California) (requiring proof of reliance only under certain circumstances). Because we think the dissent mistakes the meaning of reliance, we needn't further discuss its critiques—or the manifold constitutional violations it alleges.

district court leaned heavily on the notion that reliance can sometimes be *presumed*. Although the court acknowledged that "a presumption of . . . reliance is only appropriate in some states and in some fact patterns," one of those "fact patterns," it said, was "when a [d]efendant's representations to the entire class were uniform." The court reasoned that "Ford's representations to Plaintiffs were uniform" and that "the evidence appears to show that no class member could possibly have known [about the defect] from Ford[.]" Accordingly, it concluded that a presumption of reliance was appropriate in this case—and, therefore, that individualized reliance issues didn't present a predominance-related barrier to class certification.

The root of the district court's error was in overgeneralizing the presumption-of-reliance issue. The court's task was to "predict[] how the parties will prove" common and individualized questions. *Brown*, 817 F.3d at 1234. But doing so requires carefully examining the particular state laws on which plaintiffs' claims in this case are based. True, a presumption that a plaintiff or group of plaintiffs relied on Ford's misstatements *may* apply—but only if the relevant state's common-law-fraud cause of action or deceptive-practices statute allows for that presumption. And while the district court seemed to appreciate that the presumption was "only appropriate in some states," it never seriously investigated whether and under what circumstances each of the various state-law claims at issue permit the presumption. *See, e.g.*, Doc. 231 at 43 (California); *id*. at 44 (Missouri); *id*. at 45 (Tennessee); *id*. at 45 (Texas).

In fact, as we'll see, states' fraud-based causes of action meaningfully differ in terms of both whether proof of reliance is necessary and, if it is, how it is established. Reliance is often, though not uniformly, an essential element of a fraud-based claim. Where it is, it sometimes must be affirmatively proved; in other circumstances, it may be presumed. Affirmatively proving reliance is a very individualized inquiry, the kind that would predominate over other common questions in a class action. By contrast, where the presumption of reliance applies, it does so generally and can therefore be resolved on a class-wide basis.

Bottom line: To assess Rule 23(b)(3)'s predominance requirement, we must consider whether each cause of action at issue here requires proof of reliance and, if so, whether and under what circumstances a presumption of reliance is appropriate.

**B**

So a (perhaps *the*) key issue in this case is whether each of the several state-law causes of action that plaintiffs have alleged permits a presumption of reliance and, if it does, under what circumstances. That's a question that we'll need to decide on a state-by-state (and claim-by-claim) basis, and we'll get to those details soon enough. But first, a more general, preliminary point. All seem to recognize—and we agree—that the permissibility of a presumption of reliance will often turn on whether a fraud-based claim primarily alleges affirmative misrepresentations, omissions (or nondisclosures), or, perhaps, a mixture of both.

While not strictly applicable here, cases decided under the federal securities laws illustrate the distinction between misrepresentations and omissions, as well as the effect that distinction can have on the operation of the presumption of reliance.  Here's a brief summary:  In *Affiliated Ute Citizens of Utah v. United States*, the Supreme Court held, in a case arising under Rule 10b-5, that "[u]nder the circumstances of th[e] case" before it, which "involv[ed] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery," but rather may be presumed.  406 U.S. 128, 153 (1972).  Significantly, though, we have since clarified that the *Ute* presumption applies *only* to cases "involving primarily a failure to disclose in which defendants who had an affirmative duty to disclose stood mute, leaving plaintiffs with absolutely nothing upon which to rely."  *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 547 (5th Cir. Unit A March 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983) ("If a person who has an 'affirmative duty under [Rule 10b-5] to disclose' a material fact" fails to disclose "material facts that reasonably could be expected to influence [a security-holder's] decision to sell, positive proof of reliance . . . is not a prerequisite to recovery.").  No presumption of reliance applies, we have emphasized, either in cases primarily alleging affirmative misrepresentations or in those "mixing allegations of omissions and misstatements."  *Cavalier Carpets*, 746 F.2d at 757.  So, for instance, in a securities case where plaintiffs "alleged three omissions and three misstatements," the "mixed case rule of

*Huddleston*" applied—meaning that a presumption of reliance did not. *Id*.[5]

So, what kind of claims have plaintiffs alleged here? Perhaps not surprisingly, especially given *Ute* and its underlying principles, plaintiffs insist that their case is solely about omissions. *See* Br. of Appellees at 4 ("[T]he fraud-based class claims are based solely on omissions."). Equally unsurprisingly, Ford counters that this is fundamentally a case about affirmative misrepresentations or, at the very least, a "mixed" case. *See* Reply Br. of Appellants at 1 ("The record in this case could not be clearer that plaintiffs' fraud-based claims rest on Ford's alleged affirmative misrepresentations concerning the track capabilities of plaintiffs' vehicles."). Having considered plaintiffs' own framing of their claims, the basic facts

---

[5] We implemented this framework in the class-action context in *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987). There, as here, the parties debated whether individual reliance issues defeated Rule 23(b)(3)'s predominance requirement, and there, as here, the answer to that question depended, in part, on whether a *Ute*-like presumption of reliance applied. We held that the plaintiffs' claims there couldn't "be properly characterized as omissions cases" under *Ute* because they didn't allege that "'[t]he defendants . . . st[ood] mute in the face of a duty to disclose.'" *Id*. at 722 (quoting *Cavalier Carpets*, 746 F.2d at 749 n.22). Rather, we explained, the plaintiffs asserted that "the defendants 'undertook . . . to disclose relevant information . . . alleged to contain certain misstatements of fact and [that] fail[ed] to contain other facts necessary to make the statements made, in light of the circumstances, not misleading.'" *Id*. (quoting *Cavalier Carpets*, 746 F.2d at 749 n.22) (alterations in original). Accordingly, we held that "the complaints at most allege[d] mixed claims of misrepresentations and omissions," that *Ute*'s "presumption of reliance d[id] not apply," and, therefore, that (at least on that ground) the presumption couldn't eliminate individualized reliance issues. *Id*.

underlying those claims, and the district court's treatment of the various allegations in the case, we conclude that Ford has the better of the argument: At its core, this case is about misrepresentations, not omissions.

For starters, plaintiffs' own complaint repeatedly targets Ford's "marketing" and "advertising." Doc. 43 at 69–86. Indeed, the complaint's first factual allegation concerns plaintiffs' shared love of track racing—the very subject of Ford's alleged misrepresentation about the Shelby's track-readiness. *Id.* at 69–70. Plaintiffs' motion for class certification and their response to Ford's Rule 23(f) petition likewise both repeatedly complain about Ford's "marketing communications." *See* Doc. 122 at 8, 10–11, 15–18; Br. of Plaintiff-Respondents in Response to Petition for Permission to Appeal at 3–5, *Ford Motor Company v. George Tershakovec, et al.*, No. 21-90019 (11th Cir. Feb. 28, 2022). Even before us, plaintiffs continue to focus on Ford's "advertising." Br. of Appellees at 12–14. And that focus makes sense. Plaintiffs' grievance, fundamentally, is that Ford misled them to believe that their Shelbys could zip around racetracks for hours. And they arrived at that belief not as a result of Ford's mere silence but, rather, they claim, as a result of Ford's boasting about the Shelby's track-readiness.

The district court itself treated plaintiffs' claims as primarily alleging affirmative misrepresentations. In its order granting class certification, for instance, the court described plaintiffs' theory as follows: "Ford advertised all Shelbys as track-capable, the advertising induced Plaintiffs to purchase the car, and then the car did not

perform as advertised." Doc. 231 at 3. Contrast that with a claim that plaintiffs pleaded in their complaint but that the district court later dismissed. There, plaintiffs separately alleged that their Shelbys can enter "limp mode" even during *non*-track conditions, when being driven normally. *See* Doc. 43 at 72. Notably, the district court referred to this as "*the* omission claim[]"—and rejected it on the ground that there was no evidence that Ford was aware of the defect and thus couldn't have fraudulently concealed it. Doc. 231 at 13–15 (emphasis added).

In the end, even interpreted charitably, plaintiffs' current claims allege an omission only derivatively: Ford affirmatively misrepresented the Shelbys as track-capable, which entailed an implicit "omission" that the cars can enter "limp mode" under track conditions. In the language of our securities cases, plaintiffs don't allege that Ford "st[ood] mute in the face of a duty to disclose"; rather, they contend that it made misstatements of fact and then failed to include "other facts necessary to make the statements . . . not misleading." *Kirkpatrick*, 827 F.2d at 722 (quotation omitted). And as already explained, that means that plaintiffs' complaint "at most allege[s] mixed claims of misrepresentations and omissions." *Id*.

Having established that plaintiffs' case is fundamentally about misrepresentations—or, at most, a mix of misrepresentations and corollary omissions—we're ready to dive into the central question: Which of the various fraud-based causes of action that plaintiffs have alleged requires proof of reliance, and which among

those permits reliance to be presumed—and under what circumstances?[6]

## C

On, then, to the core of our analysis. Because different states' fraud-related causes of action—both statutory and common-law—treat reliance differently, we have to get into the specifics of those laws. We find that we can group plaintiffs' claims into

---

[6] One final bit of housekeeping: Echoing the district court, plaintiffs cite our decision in *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), for the proposition that common evidence can be used to prove reliance on a class-wide basis. *Klay* is distinguishable in important respects. True, we held there that a class of physicians who brought a RICO-based action against an HMO for misrepresenting that it would pay for medically necessary procedures had to prove reliance. And true, we held that their reliance could be proved through common evidence. *Id.* at 1257. But we did so for two reasons unique to the transactions at issue there, neither of which applies here. First, we emphasized that the doctors relied on the HMO's standardized misrepresentation that they would be reimbursed for medically necessary services provided to insureds and that the HMO's nationwide conspiracy to underpay doctors was the "very gravamen of the RICO claims." *Id.* And second, we stressed that the transactional exchange between the physicians and the HMO hinged on the latter's payment guarantees, which served as the "heart of the[] agreements" and was the *"very consideration"* upon which those agreements are based." *Id.* at 1259 (emphasis added). As the Second Circuit has observed, contractual financial transactions between a purchaser and provider of medical services don't implicate "the same type or degree of personal idiosyncratic choice as does a consumer purchase." *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008). While one who provides services in exchange for a payment relies only on the payment guarantee, a purchaser of a car may choose to rely on any of a number of marketing and branding representations.

three categories.  First, some causes of action don't require proof of reliance at all.  Needless to say, reliance poses no predominance-related barrier to class treatment of those claims.  Second—at the other end of the spectrum, so to speak—some claims require individual plaintiffs to prove reliance affirmatively, without the benefit of any presumption.  Rule 23(b)(3)'s predominance requirement will bar class treatment of those claims, as the facts pertinent to reliance will have to be proved on a plaintiff-by-plaintiff basis.  Finally—in the middle—under some causes of action, proof of reliance is required but may be presumed, at least under certain circumstances.  Whether the predominance requirement can be satisfied for those claims depends on details specific to this case, some of which the district court will need to investigate on remand.

In the sections that follow, we'll sort the claims that plaintiffs have alleged into these three categories.

## 1

The first category comprises state causes of action that don't require proof of reliance.  Rule 23(b)(3)'s predominance requirement poses no barrier to class treatment of these claims because it's unnecessary to make any individualized inquiry into what each plaintiff knew and relied on in purchasing his or her Shelby.  Four of plaintiffs' claims fall into this category.

Three are easy.  First, the district court certified a class of plaintiffs who sued under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*.  To establish a consumer claim for damages under FDUTPA, a plaintiff must show (1) a

deceptive act or unfair practice, (2) causation, and (3) actual damages. *Carriuolo v. General Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th Dist. Ct. App. 2008)). Dispositively here, "a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue." *Id*. at 985 (quotation omitted). Because a FDUTPA plaintiff needn't prove that he or she relied on any alleged misstatement, Ford's reliance-based predominance objection fails.

Second, the district court certified a class of plaintiffs alleging claims under New York's consumer-fraud statute, N.Y. Gen. Bus. Law § 349(a) (McKinney). As the Second Circuit has explained, a "§ 349 claim has three elements: (1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *see also Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744–45 (N.Y. 1995). Again, dispositively, private actions brought under § 349 do "not require proof of actual reliance." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citing *Stutman v. Chemical Bank*, 731 N.E.2d 608, 612 (N.Y. 2000)). So there can be no reliance-based predominance objection to class treatment of plaintiffs' § 349 claims, either.

Third, the district court certified a class of plaintiffs alleging claims under Washington's consumer-fraud statute, which

prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Washington courts have held that a plaintiff suing under the statute must prove "a causal link between the act and the injury." *Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1221 (Wash. 2019). But they have clarified that reliance is merely one way to establish causation—reliance is not itself a necessary element. *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 592 (Wash. 2015) ("[I]n *Indoor Billboard* this court rejected the principle that reliance is necessarily an element of plaintiff's CPA claim.") (citing *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10 (Wash. 2007)); *see also Young v. Toyota Motor Sales, U.S.A.*, 472 P.3d 990, 996 (Wash. 2020) ("We rejected the company's argument that as a matter of law, any false or deceptive act it committed could not be the cause of the plaintiff's injury because the customer could not show he relied on the deceptive act in deciding to pay the bill."). Accordingly, as with the statutory claims arising under Florida and New York law, Ford's reliance-based predominance objection to certifying the Washington consumer-fraud claims fails.

A final claim also belongs in this category. The Missouri Merchandising Practices Act prohibits "deception, fraud, . . . misrepresentation, . . . or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1 (2020). As Ford has acknowledged, the MMPA does not by its terms require a plaintiff to prove that he or she relied on forbidden misrepresentations. *See* Oral Arg. at 7:22–7:35. And indeed,

Missouri courts have repeatedly observed that "[a] consumer's reliance on an unlawful practice is not required under the MMPA." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (quotation omitted); *accord, e.g.*, *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) ("[A] fraud claim requires both proof of reliance and intent to induce reliance; the [M]MPA claim expressly does not.").

Even so, citing *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855 (Mo. 2008), Ford asks us to imply a reliance element for MMPA claims. But *Coca-Cola* isn't quite on point. There, plaintiffs sought to certify a class of consumers who alleged that they wouldn't have purchased certain Diet Coke products had they known that they contained both saccharin and aspartame, rather than just aspartame as advertised. *Id*. at 858. Evidence showed, however, that the "proposed class undoubtedly include[d] an extremely large number of uninjured class members, that is, those who did not care if the Diet Coke they purchased contained saccharin." *Id*. at 862. The Missouri Supreme Court declined to "imply" harm with respect to those "uninjured" plaintiffs and affirmed the district court's denial of class certification on the ground that the class was "overbroad." *Id*. at 862–63. Although we understand Ford's point, *Coca-Cola* was concerned about an altogether different element—injury—and the proper definition of classes, not the existence or non-existence of a reliance requirement.

Nor does *White v. Just Born, Inc.*, No. 2:17-cv-04025-NKL, 2018 WL 3748405 (W.D. Mo. Aug. 7, 2018), persuade us that the

MMPA entails an implicit reliance requirement. In fact, the *White* court cited the Missouri Court of Appeals's decision in *Murphy*, already noted, for the proposition that "[a] consumer's reliance on an unlawful practice is not required under the MMPA." *Id.* at *4. It's true that the federal district court in *White* held that class certification was improper there because individualized issues concerning plaintiffs' injuries and causation would predominate over common ones. *See id.* But state courts in Missouri have held that the injury- and causation-related elements of an MMPA claim can be established class-wide under what those courts call a "benefit-of-the-bargain rule." *See, e.g., Plubell v. Merck & Co.*, 289 S.W.3d 707, 714–15 (Mo. Ct. App. 2009); *Craft v. Phillip Morris Companies, Inc.*, No. 002-00406A, 2003 WL 23355745, at *8–9 (Mo. Cir. Ct. Dec. 31, 2003) ("[T]he necessary causation element is satisfied under § 407.025, as is the economic harm element, whenever a plaintiff can simply show that he purchased a product that was falsely represented, and that he thereby received a product that would have been worth more money if it had truly been as represented."). Accordingly, we reject Ford's contention that individualized reliance issues prevent certification of plaintiffs alleging MMPA claims.

### 2

The second category occupies the opposite pole—it comprises those causes of action (1) that require a plaintiff to prove that he or she relied on a defendant's misinformation and (2) that don't recognize a presumption of reliance. Plaintiffs' claims brought under these causes of action can't be certified for class treatment because proving an individual's reliance will necessarily require

individualized evidence.  We conclude that, as relevant here, this category includes four claims.

Proving a negative—here, that the causes of action in this group don't allow reliance to be presumed—can be tricky, of course.  Some state courts have simplified our task by expressly interpreting their own law to exclude the presumption.  More often, though, our research has revealed decisions that (1) clearly require proof of reliance and (2) then contain no suggestion that reliance may be presumed or otherwise inferred.  Absent any indication that a presumption is permissible, we decline to expand state law to include one.  *See, e.g.*, *Salinero v. Johnson & Johnson*, 995 F.3d 959, 967 (11th Cir. 2021) ("For us to create a wholly new doctrine, virtually out of whole cloth, would work a profound change in Florida's law.").

The district court certified a class of plaintiffs who sued under the Texas Deceptive Trade Practices-Consumer Protect Act.  That statute prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and expressly requires a plaintiff to prove, among other things, that he or she "relied on" an enumerated act or practice "to [his or her] detriment," *id*. § 17.50(a)(1)(B).  Importantly here, we have previously held that the Texas statute requires a plaintiff to prove that he or she "actually did rely" on the "statement or omission."  *Brown*, 817 F.3d at 1236 (quotation and emphasis omitted).  Because a plaintiff must prove actual reliance— seemingly without the benefit of any presumption—claims

brought under the Texas statute will turn on individualized issues that make them inappropriate for class treatment.

The district court also certified a class of plaintiffs who alleged common-law fraud claims under Washington law. Washington courts have held that a fraud plaintiff must prove, among other things, "the listener's reliance on the false representation, [] the listener's right to rely on the representation, and [] damage from reliance on the false representation." *Landstar Inway Inc. v. Samrow*, 325 P.3d 327, 337 (Wash. App. 2014) (citing *Baertschi v. Jordan*, 413 P.2d 657, 660 (Wash. 1966)). To be sure, that description doesn't expressly foreclose a presumption of reliance, but neither it nor any other that we've found expressly authorizes one, and we decline to graft one onto Washington law.[7] So plaintiffs' Washington common-law fraud claims are not appropriate for class treatment.

The district court's certification of plaintiffs' New York common-law fraud claims was also improper. According to the New York Court of Appeals, the elements of a New York common-law fraud claim include, among others, "justifiable reliance by the plaintiff." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009). Indeed, that court has emphasized that

---

[7] Plaintiffs point to a pure-omission case, in which they say that the court (in accordance with the rules that typically apply in federal-law cases, *see supra* at 11–12) approved a rebuttable presumption of reliance on the ground that "it is virtually impossible to prove reliance in cases alleging nondisclosure of material facts." *Morris v. International Yogurt Co.*, 729 P.2d 33, 41 (Wash. 1986). For reasons already explained, though, this is not a pure-omission case. *See supra* at 12–14. *Morris* is therefore inapposite.

"[j]ustifiable reliance is a 'fundamental precept' of a fraud cause of action." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018) (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959)). Absent support for presuming reliance under New York law—of which we have been shown none—individualized issues prevent class treatment.

So too with respect to plaintiffs' Tennessee common-law fraud claims. "In an action for fraudulent misrepresentation" brought under Tennessee law, "a plaintiff must show," among other elements, that he or she "acted reasonably in relying on the representation." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 738 (Tenn. Ct. App. 1996). And courts applying Tennessee law have looked to a whole host of factors "in determining whether a party reasonably relied," all of which turn on individualized facts about the plaintiff, the defendant, and the specifics of their relationship. *See, e.g.*, *Boynton v. Headwaters, Inc.*, 737 F. Supp. 2d 925, 931 (W.D. Tenn. 2010) (citing *City State Bank*, 948 S.W.2d at 737). Accordingly, plaintiffs' Tennessee common-law claims will turn on individualized issues that make class treatment inappropriate.

### 3

The third category includes causes of action that require proof of reliance but allow it to be presumed in certain circumstances. Class certification may be appropriate with respect to plaintiffs pursuing claims in this category—but only if the circumstances support the presumption's application. This category, we

conclude, covers the California claims, both statutory and common-law.

First, what we'll call the California statutory claim. Technically, plaintiffs have presented claims under three different California statutes—the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, the False Advertising Law, *id.* § 17500, and the Consumer Legal Remedies Act, Cal. Civ. Code § 1770. But because all three have similar reliance requirements, we treat them together. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020) ("Any violation of the FAL necessarily violates the UCL."); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (discussing reliance in the context of both the UCL and FAL). California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.[8] Courts applying California law have held that a presumption of reliance may be appropriate for statutory claims, but only when "the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020) (UCL and FAL presumption); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (likewise applying a reliance presumption under the CLRA where "the trial court finds that material misrepresentations have been

---

[8] The False Advertising Law, Cal. Bus. & Prof. Code § 17500, and Consumer Legal Remedies Act, Cal. Civ. Code § 1770, prohibit similar misrepresentations in commercial transactions.

made to the entire class") (quotation omitted). So far as we can tell, the district court never considered whether that precondition to the presumption's application obtained here. On remand, the court must therefore determine whether plaintiffs have established that Ford "pervasively disseminated" material misrepresentations.

Second, the California common-law claim. "The necessary elements of fraud" under California law include, among others, proof (1) that the defendant "inten[ded] to defraud (i.e., to induce reliance [by])" the plaintiff and (2) that the plaintiff "justifiabl[y] reli[ed]" on the defendant's misinformation. *Alliance Mortg. Co. v. Rothwell*, 900 P.2d 601, 608 (Cal. 1995). "California courts have always required plaintiffs in actions for deceit to plead and prove the common law element of actual reliance." *Mirkin v. Wasserman*, 858 P.2d 568, 572 (Cal. 1993) (citations omitted). As in the statutory context, though, California courts have permitted a presumption of reliance "when the same material misrepresentations have actually been communicated to each member of a class." *Id.* at 575 (emphasis omitted). Because the district court didn't consider whether that precondition to the reliance presumption was satisfied, it will need to make that determination on remand.

## D

Finally, we turn to the two certified classes—one in California, one in Texas—for breach-of-implied-warranty claims and violations of the federal Magnuson-Moss Warranty Act. The Magnuson-Moss Act merely "supplement[s] state-law implied warranties" by "affording a federal remedy for their breach," *Richardson v.*

*Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325 (11th Cir. 2001) (internal citations omitted), so the Magnuson-Moss claims can be certified only if the state-law breach-of-implied-warranty claims are also certified. *See* 15 U.S.C. § 2308; *see also Brown*, 817 F.3d at 1231 ("The claims under the Magnuson-Moss Act are identical to the other warranty claims because they are also based on state law.").

In *Brown*, we held that to certify California and Texas implied-warranty classes, like those here, the district court first needed to decide "whether California and Texas law require pre-suit notice, an opportunity to cure, and manifestation of the defect." 817 F.3d at 1237. The answers to these questions were important, we explained, as they "bear on predominance." *Id.* at 1238. As we have explained:

> If California and Texas law do not excuse pre-suit notice and an opportunity to cure when the defendant had prior knowledge of the design defect, as the district court speculated, then each class member will need to prove that he gave [the defendant] pre-suit notice and an opportunity to cure. This showing could require individual proof. And if California and Texas law require the defect to manifest, then each class member will need to prove that his washing machine actually grew mildew during the warranty period. This showing could also require individual proof. Because the answers to these preliminary questions of California and Texas law could affect whether Rule 23(b)(3) is satisfied, the district court had a duty to resolve them.

*Id.* (citations and quotation marks omitted).

The district court here said only (1) that "notice is an individual issue," (2) that the notice issue "is a simple one" that could be determined by a claims administrator, and (3) that the "big question of whether the product was defective at the time it was sold is a common one." *Brown* requires more than that. Here, nothing indicates that the district court determined "what the law is in California and Texas," which would, in turn, "help it identify the overall mix of individual versus common questions for purposes of predominance." *Id.*

For this reason, we must "remand to the district court so it can answer these questions of state law in the first instance." *Id.* We express no view on whether the implied-warranty claims will ultimately satisfy the predominance requirement for class certification.

## IV

Having tackled the predominance inquiry, we turn to superiority. Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority requirement includes consideration of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Ford contends that the class action that the district court certified isn't the superior means of adjudicating plaintiffs' claims because it's unmanageable. In particular, Ford fears that jurors will have to remember testimony from multiple witnesses, all while keeping track of the class members'

states, the applicable common-law rules and statutes, and burdens of proof.

The district court acknowledged that authorizing a single trial for eleven proposed state-law classes was "unusual," but it asserted that it could deal with the complexity by issuing "appropriate jury instructions" and "multiple verdict forms that tick through the [varying] elements of [the] certified state class[es]' statutory and common law fraud claims."  We aren't so confident.

"Rule 23 demands an early consideration of class certification, including its practical implications for case manageability." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 (11th Cir. 2009).  For reasons we have already explained, Rule 23(b)(3) certification was improper for classes that require individualized proof of each plaintiff's reliance on Ford's alleged misstatements.  Our vacatur of the district court's certification of several classes and our ensuing remand will necessarily affect the scope and course of the proceedings—and with it, the manageability of those proceedings.  The district court should consider the manageability challenges anew on remand and should more clearly articulate a plan for addressing them to ensure that the difficulties of managing the class action do not impede the fair and efficient adjudication of the case.

## V

In summary, we affirm the district court's certification of the statutory classes in Florida, New York, Missouri, and Washington. We reverse certification of the Texas statutory consumer-fraud claim and the Tennessee, New York, and Washington common-law

fraud claims.  And we remand for the district court to consider whether the facts in this case support a presumption of reliance for the California statutory and common-law fraud claims and whether the California- and Texas-based breach-of-implied-warranty claims satisfy state-law requirements.  Finally, we instruct the district court on remand to reconsider the manageability issue.[9]

       **AFFIRMED** in part, **REVERSED** in part, and **VACATED** and **REMANDED** in part.

---

[9] Plaintiffs' motion to dismiss Ford's appeal as improvidently granted is DE-NIED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I agree with the Majority that required proof of reliance makes class certification of the Texas Deceptive Trade Practices-Consumer Protect Act claim, and the Tennessee, Washington, and New York common law fraud claims inappropriate.[1]  I part company with the Majority, however, regarding the certification of the classes for the Florida, New York, Missouri, California, and Washington statutory claims, as well as the California common law claim.  I do not believe these six classes satisfy Rule 23(b)(3)'s predominance requirement, and I would decertify them.

My reasoning derives from lifting the hood and examining the various parts of the law before this Court on appeal.  At first glance, the six claims with which I disagree with the Majority look ready to drive off the lot, but in fact, they are lemons.  Here is the User's Manual for this opinion as we engage in a multi-point diagnostic.  This opinion (1) begins by surveying the consumer protection scheme provided by the Federal Trade Commission Act (the "FTC Act"); (2) compares and contrasts that scheme to the mechanisms established by Florida, New York, Missouri, Washington, and California's respective consumer protection statutes; (3) identifies the inherent causal mechanism required for misrepresentation causes of action; (4) outlines four constitutional defects—First

---

[1] I also concur with the Majority's treatment of the California and Texas implied warranty classes.  Those classes are properly remanded to the District Court under *Brown v. Electrolux Homes Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016).

Amendment, due process, Article III standing, and separation of powers—inherent in allowing certification of claims under these statutes; and (5) explains why none of the cases cited by the Majority ought to bind or persuade this Court.

## I.

The FTC Act declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  That which the FTC Act declares unlawful is vague.  How will a business know how to conduct its affairs?  How will it know what constitutes an unfair method of competition or an unfair or deceptive act or practice prohibited under the act?  The Federal Trade Commission (the "FTC") will tell it.  *See id.* § 45(a)(2) (empowering and directing the FTC "to *prevent* persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce" (emphasis added)).  But the way the FTC tells businesses that they are violating the FTC Act provides notice before punishment.  To get a sense of this process, let us walk through a hypothetical FTC action as outlined by the FTC Act.

Charlie owns Brown's Gas and an attached hamburger stand—called the Chuck Wagon and run by his business partner, Patty—off a state highway between fictional towns Riverton and Clifton.  Travelers from Clifton pass Brown's Gas on their way out of town and never fuel up—even though they love Patty's burgers—because Charlie consistently charges $3 more per gallon than

the average price in Clifton.  Travelers from Riverton, on the other hand, pass Brown's Gas after having driven 120 miles with no gas station, and those travelers cannot see that Clifton lies just on the other side of a hill.  The Riverton travelers consistently fill up with Charlie's inflated fuel.

Enter the FTC.  The FTC determines that this sort of behavior "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  *Id.* § 45(n).  Having "reason to believe" Charlie is violating one of the FTC's definitions of a practice that violates the FTC Act, the FTC serves Charlie with a complaint and schedules a hearing—which must be at least thirty days later.  *Id.* § 45(b).  Charlie has the "right to appear" at this hearing and "show cause why a[ forward-looking cease and desist] order should not be entered by the Commission."  *Id.*

The FTC ultimately issues Charlie a cease and desist order, which Charlie can appeal to a United States court of appeals.[2]  *Id.* § 45(c).  Charlie has not yet been punished for his business practice.  He has merely been told that he cannot continue it in the future.  Any further engagement in the practice—assuming the court of

---

[2] "To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission."  15 U.S.C. § 45(c).

4          TJOFLAT, J., Concurring and Dissenting in Part  22-10575

appeals affirms the FTC—is punishable by the court's contempt power.

After the cease and desist order "has become final,"[3] Charlie continues to charge $3 more per gallon than other Clifton establishments, and so, the Attorney General can now file a civil action against Charlie for a monetary penalty.[4]  *Id.* § 45(l).  With that final order—Charlie is therefore already on notice that his actions violate the FTC Act—United States district courts are empowered to grant "equitable relief" in addition to mandatory injunctions and civil penalties.  *Id.*  This equitable relief may include restitution.  *Id.* § 45(a)(4)(B).

Importantly for the claims against Ford, the FTC Act does not allow for damages and contains no private right of action.  *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 987 (D.C. Cir. 1973) ("[P]rivate actions to vindicate rights asserted under the Federal Trade Commission Act may not be maintained."); *id.* at 999–1000 (recognizing that "the FTC has no power to award damages" and

---

[3] Relevantly, the order becomes final at the judgment and decree of an affirming court, *id.* § 45(c), unless the Supreme Court grants certiorari.  *Id.* § 45(g)(2)(C), (3)(C) & (4)(C); *id.* § 45(h).  Or the order becomes final if the time to appeal the FTC's order to a court of appeals lapses, *id.* § 45(g), with time built in to allow for petitions for review.  *Id.* § 45(i).

[4] The FTC would also be able to recover civil penalties from Charlie before issuing a final order if Charlie committed an unfair or deceptive act or practice "with actual knowledge or knowledge fairly implied on the basis of objective circumstances."  *Id.* § 45(m)(1)(A), (B)(2).  The mental state here constitutes the notice that Charlie was performing a bad act.

that the "1938 amendments [to the FTC Act] relied instead on the FTC's cease and desist procedures, and their provision of opportunity for voluntary compliance and informal administrative conflict resolution"); *Fulton v. Hecht*, 580 F.2d 1243, 1249 n.2 (5th Cir. 1978) ("[T]here is no private cause of action for violation of the FTC Act.");[5] *Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992) ("[T]here is no private right of action under [the FTC Act]."). Rather, section 5 of the FTC Act empowers the FTC itself or the Attorney General—both arms of the government—to pursue violators for forward-looking relief and, after notice and opportunity to be heard, civil penalties.

While the state consumer protection statutes at issue in this appeal derive from the FTC Act, the differences cause problems that we will come back to later.

### A.

Florida's analogous consumer protection statute, the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") declares a similarly vague set of acts unlawful.[6] Fla. Stat. § 501.204(1). Interestingly, the FDUTPA's text clearly directs the courts and the executive branch to give "due consideration and great weight . . .

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the Former Fifth Circuit handed down prior to October 1, 1981.

[6] The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act."[7]  *Id.* § 501.204(2) (citing 15 U.S.C. § 45(a)(1)).  This means, despite the vague language in the FDUTPA, a person in Charlie's shoes could be on notice about his behavior if a successful, similar action was brought against someone else *either* under the FDUTPA, *or* federally under the FTC Act.

Florida's Department of Legal Affairs, like the FTC, has power to issue cease and desist orders; a defendant business has the right (1) to respond to the complaint at a hearing and (2) to judicial review of the ultimate agency decision.  *Id.* §§ 501.208(1), 501.208(3) (citing Fla. Stat. § 120.68).  *After a cease and desist order becomes final*, the Department of Legal Affairs may pursue civil penalties for violations.[8]  *Id.* § 501.208(7).  Finally, the Department of Legal Affairs[9] may pursue three remedies in court: (1) a *forward-*

---

[7] The state's Department of Legal Affairs possesses rulemaking authority to administer the FDUTPA, but all substantive rules must conform with the "rules, regulations, and decisions of the [FTC] and the federal courts in interpreting the provisions of s. 5(a)(1) of the [FTC] Act." *Id.* § 501.205.

[8] The Department of Legal Affairs—or the "office of the state attorney if a violation of this part occurs in or affects the judicial circuit under the office's jurisdiction," *id.* § 501.203(2)—may also pursue civil penalties prior to a final cease and desist order if the defendant "is willfully using, or has willfully used, a method, act, or practice declared unlawful under [Fla. Stat. § 501.204], or who is willfully violating any of the rules of the department adopted under this part." *Id.* § 501.2075.  Much like with the FTC Act, the mental state serves as the notice.

[9] Or the office of the state attorney.  *See supra* n.8.

*looking* declaratory judgment that an act or practice violates the FDUTPA; (2) a *forward-looking* injunction against a defendant business "who has violated, is violating, or is otherwise likely to violate" the FDUTPA; or (3) a suit on behalf of one or more consumers to recover "actual damages caused by" a violating act or practice. *Id.* § 501.207. Until this last remedy, the FDUTPA follows the FTC Act's pattern of only *preventing* future action *unless* the defendant has been placed on notice that a particular act or practice violates the statute.

The FDUTPA continues differentiating itself from the FTC Act by providing two private rights of action. Anyone "aggrieved by a violation of" the FDUTPA can bring a declaratory judgment action and enjoin a "person who has violated, is violating, or is otherwise likely to violate" the FDUTPA. *Id.* § 501.211(1). While private, this cause of action is still forward-looking. Additionally, someone "who has suffered a loss as a result of a violation of" the FDUTPA "may recover actual damages, plus attorney's fees and court costs." *Id.* § 501.211(2). Therefore, despite closely hewing to the FTC Act and its interpretations, the FDUTPA has two features the FTC Act does not: private rights of action and backward-looking damages provisions.

*B.*

New York's consumer protection law also utilizes vague language.[10]  The statute authorizes the state attorney general to enjoin (forward-looking) unlawful acts or practices by anyone who "has engaged in or is about to engage in any of the acts or practices stated to be unlawful."  N.Y. Gen. Bus. Law § 349(b).  The attorney general can also "obtain restitution of any moneys or property obtained directly or indirectly" by the unlawful acts or practices.  *Id.*  The statute requires the attorney general "to give the person against whom such proceeding is contemplated notice . . . and an opportunity to show in writing . . . why proceedings should not be instituted against him."[11]  *Id.* § 349(c).

In addition to enforcement actions by the attorney general, "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  *Id.* § 349(h).

---

[10] The statute declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a).

[11] The statute provides an exception to the notice and opportunity to be heard when the attorney general seeks preliminary relief and finds "that to give such notice and opportunity is not in the public interest."  *Id.* § 349(c).

22-10575  Tjoflat, J., Concurring and Dissenting in Part        9

Much like the FDUTPA, the New York statute adds private rights of action and backward-looking relief to the FTC Act scheme.[12]

*C.*

The Missouri Merchandising Practices Act (the "MMPA") more specifically defines the prohibited acts under the statute than do the Florida and New York statutes, including specifically prohibiting "misrepresentation."[13]  Mo. Rev. Stat. § 407.020(1).[14]  The state attorney general may issue and serve "an order prohibiting" a person from "engaging or continuing to engage in" a violation of the MMPA *after* notifying the defendant business of the supposed violation and allowing two business days from receipt of the notification for the business to answer.[15]  *Id.* § 407.095(1).

The MMPA authorizes the attorney general to pursue forward-looking injunctions against further violations of the MMPA and authorizes courts in such actions to award restitution "as may

---

[12] The New York statute specifically allows for acting in conformance with the rules, regulations, and statutes administered and interpreted by the FTC to serve as a complete defense to claims under the New York consumer protection law.  *Id.* § 349(d).

[13] The MMPA declares unlawful "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  Mo. Rev. Stat. § 407.020(1).

[14] The MMPA makes the willful and knowing violation of the act a felonious criminal offense.  *Id.* § 407.020(3).

[15] The attorney general may also initiate an investigation of any suspected violation of the MMPA.  *Id.* § 407.040.

be necessary to restore to any person who has suffered any ascer-
tainable loss . . . which may have been acquired by means of any"
violation of the MMPA.  *Id.* § 407.100(1), (4).  The MMPA also au-
thorizes civil penalties where the defendant is already on notice of
its conduct: for violations of voluntary compliance agreements be-
tween the business and the attorney general, *id.* § 407.030(2), or for
violations of the "terms of an injunction, an order to make restitu-
tion, or any other judgment or order issued under section
407.100."[16]  *Id.* § 407.110.

    Much like the Florida and New York statutes, the MMPA
authorizes a private cause of action to recover damages to those
who "suffer[] an ascertainable loss of money or property, real or
personal, as a result of" an MMPA violation.  *Id.* § 407.025.  In so
doing, the MMPA endorses an objective test for damages.[17]  *Id.*
§ 407.025(1)(2).  The MMPA also specifically authorizes class

---

[16] Willfully and knowingly violating an attorney general's order under the
MMPA carries a felony criminal penalty.  *Id.* § 407.095(3).

[17] The elements of an MMPA private cause of action are:

> (a)    That the person acted as a reasonable consumer would
> in light of all circumstances;

> (b)    That the method, act, or practice declared unlawful by
> [the MMPA] would cause a reasonable person to enter into the
> transaction that resulted in damages; and

> (c)    Individual damages with sufficiently definitive and ob-
> jective evidence to allow the loss to be calculated with a rea-
> sonable degree of certainty.

*Id.* § 407.025(1)(2).

actions for damages, *id.* § 407.025(5)–(9), and states that unnamed class members "shall establish individual damages in a manner determined by the court." *Id.* § 407.025(5).

### D.

The Washington consumer protection statute also uses vague language to outlaw conduct.[18]  Wash. Rev. Code § 19.86.020.  The statute authorizes the state attorney general to bring a forward-looking action "to restrain and prevent the doing of any act" prohibited by the statute.  *Id.* § 19.86.080(1).  And in such an action, a court "may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of" a prohibited act.  *Id.* § 19.86.080(2).  Much like some of the other statutes, this statute provides for civil penalties for the violation of an injunction issued pursuant to this statute.  *Id.* § 19.86.140.

In addition to the attorney general's remedies, "[a]ny person who is injured in his or her business or property by a violation" of the consumer protection statute "may bring a civil action in superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both."  *Id.* § 19.86.090.

---

[18] The statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code § 19.86.020.

*E.*

Finally, the California Unfair Competition Law[19] (the "UCL") defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" Cal. Bus. & Prof. Code § 17500 *et seq.* Cal. Bus. & Prof. Code § 17200. The UCL authorizes forward-looking injunctive relief as well as "such orders or judgments" by a court "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203.

The same section provides for a private cause of action by stating, "Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204." *Id.* That standing section authorizes actions for relief under the UCL by various public parties, such as the state attorney general, or "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." *Id.* § 17204.

Much like the other five statutes, the UCL authorizes civil penalties. *Id.* § 17206. Unlike those other statutes, it does not appear that the statute provides for civil penalties only after a business has violated a court order, final agency order, or agreement; rather,

---

[19] Like the Majority and for the sake of simplicity, this opinion treats all three separate California statutes together. *See* Maj. Op. at 24 n.8.

22-10575   TJOFLAT, J., Concurring and Dissenting in Part        13

the UCL authorizes civil penalties for the bare violation of the statute itself.[20]  *Id.*

To summarize, though each of the five state consumer protection laws closely resemble the FTC Act in certain respects, they differ as well.  All five authorize damages.  All five authorize a private right of action.  All five apparently allow the respective state attorneys general to recover restitution in the initial injunctive proceeding against an alleged violator.  Missouri and California each define unlawful conduct more specifically than the FTC Act does.  Missouri, Washington, and California do not have provisions that suggest the state law must conform with FTC law.  Missouri specifically authorizes class actions and provides for an objective test to obtain private damages.  California penalizes violators without a preliminary injunctive or cease and desist step.  Finally, as a general matter, the statutes award damages only to the extent that such damages function like restitution—requiring *actual* damage.

## II.

With the statutory landscape before us, we must now define the claims with which I disagree with the Majority and determine where they fit in with that landscape.  This is an important step because these state consumer protection statutes, on their faces, cover the waterfront of prohibited conduct by outlawing anything qualified as an "unfair business practice."

---

[20] The UCL also provides for a civil penalty to punish violations of an injunction issued under the statute.  Cal. Bus. & Prof. Code § 17207.

The claims against Ford have three features that make them what I define as "Misrepresentative Advertising Class Actions." First, the claims assert that Ford's alleged unlawful conduct was contained in its advertising.  *See* Maj. Op. at 4.  Second, the claims against Ford assert that Ford misrepresented something in its advertisements, making the claims specifically about misrepresentation as opposed to some other type of unfair business practice.  *See id.* at 13.  Third, the complaint alleges harm against a class rather than against an individual or named individuals.

The significance of the class action nature will become clear in part III, and that of the advertising element in part III.A.  For now, the nature of the claims asserted against Ford as involving misrepresentation carries two significances: (1) the deleterious effects of the vague statutes are reduced and (2) misrepresentation comes with an inherent causal mechanism.

As mentioned in part I, *supra*, the consumer protection statutes at issue here—with the possible exceptions of the MMPA and the UCL—including the FTC Act itself, are written very broadly to capture much ill-defined "unfair" or "deceptive" acts in business. As part III.A will further flesh out, these statutes, standing alone, pose a notice problem.  The statute itself does not alert Charlie that what he is doing is prohibited by the statute.  To avoid the notice problem, we must find further definition of the prohibited conduct elsewhere.  There are two places to look.

First, we can look to prior decisions under the statute.  "Unfair business practice" might not in itself tell a cruise ship company

22-10575  TJOFLAT, J., Concurring and Dissenting in Part          15

that it cannot charge customers an additional fee, label it a "port charge," then pocket some of that extra money as profit.  *See, e.g.*, *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699 (Fla. 3d Dist. Ct. App. 2000).  But a previous case decided by a court under the consumer protection statute dealing with that situation would.[21]

Second, we might solve the notice issue by importing the common law definition of fraudulent misrepresentation.  In that regard, if a defendant's conduct rises to the level of common law fraudulent misrepresentation, the defendant gets his notice from the common law.  But the plaintiff would then need to make out a prima facie statutory claim by making out a prima facie misrepresentation claim—proving a misrepresentation, materiality, reliance, causation, and injury.  *See* Restatement (Second) of Torts § 525 (1977).

Therefore, to get around the notice problem inherent in the vaguely worded statutes before us, plaintiffs in a Misrepresentative Advertising Class Action have two options: present the district court with a case on point adjudicating similar behavior as violating the statute or satisfy the common law elements of misrepresentation.  Utilizing either option, a misrepresentation allegation comes with a built-in causal mechanism: reliance.  The latter option

---

[21] The FDUTPA goes one step further.  By requiring "due consideration and great weight . . . to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act," Fla. Stat. § 501.204(1), the FDUTPA also allows FTC decisions to guide the definition of prohibited conduct.

requires it explicitly while the former must require it unless a plaintiff need not prove causation.

Misrepresentation only causes harm if the misrepresentee relies on the misrepresentation of the misrepresentor.  For instance, take the instant case.  Some of the class members (1) may not have seen the advertisements at issue, (2) may not have wanted a track-ready car, or (3) wanted merely to collect the car without ever driving it around the track.  None of these three kinds of class members could have relied on Ford's alleged misrepresentation.  Either they did not see the misrepresentation, or the misrepresentation did not play any part in their decision to buy this car.  The alleged misrepresentation therefore could not have caused any complained-of harm.  Insofar as these three kinds of class members suffered an injury, it remains independent of any misrepresentation on the part of Ford.  Therefore, in a misrepresentation case, reliance is *the* causal mechanism.  No reliance inherently means no causation.

None of the consumer protection statutes at issue here— Florida, Missouri, New York, Washington, or California—explicitly disclaims a reliance element.[22]  That is to say, none of those

---

[22] The Missouri Code of State Regulations says, "Reliance, knowledge that the assertion is false or misleading, intent to defraud, intent that the consumer rely upon the assertion, or any other capable mental state such as recklessness or negligence, are not elements of misrepresentation as used in section 407.020.1." Mo. Code Regs. Ann. Tit. 15, § 60-9.070(2).  While this language appears in the regulation, the regulation merely adopts language from state court decisions.  Therefore, we also treat Missouri as if nothing in that statute

statutes say, "reliance is not an element of a cause of action under" the statute.   Rather, state court cases have interpreted the consumer protection statutes as not requiring reliance.  *See* Maj. Op. at 16–20, 23–25.  As discussed in part III.D, *infra*, by reading out a reliance element in all cases, a court usurps the legislature's power and attempts to bind future courts in a way inconsistent with our conception of judicial power.

## III.

Now that we have laid out the statutory frameworks and shown that misrepresentation claims require a showing of reliance, this opinion now explains why a Misrepresentative Advertising Class Action cannot be certified.  Certifying such a class runs afoul of the United States Constitution in four ways creating four distinct but related problems: the Free Speech Problem, the Due Process Problem, the Separation of Powers Problem, and the Standing Problem.

### A.

We begin with the Free Speech Problem.  This case involves speech because it involves advertising.  The plaintiffs claim Ford's advertisements misrepresented something to them.  While the First Amendment does not protect untruthful commercial speech, *see Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S. Ct. 1817, 1830 (1976), the judicial elimination of

---

explicitly disclaims a reliance element.  Any removal of the reliance element is a judicial removal.

a causation element makes a speaker liable for speech with or without the speech actually harming anyone.  This chills protected speech.  Let us go back to our hypothetical from part I.A.

Clifton has an ordinance that prohibits unfair business practices and enforces it by the FTC Act model.  Lucy, a resident of Clifton, needs to sell her blue car.  She takes out an advertisement in the *Clifton Chronicle* that says, "Buy my red car."  Lucy thus engages in speech—albeit unprotected speech.  If Lucy did not know the Clifton ordinance prohibited her false advertisement, that would still be ok under the FTC Act model.  Before any damages or penalties could be assessed against her, the Clifton authorities would have to tell her to stop, and if Lucy did not want to stop, she could get a court to weigh in.

Now, suppose Clifton instead has an ordinance that prohibits unfair business practices and allows for private damages.  This is closer to the state models.  Lucy advertises her blue car as a red car.  Sally agrees to buy Lucy's car on Monday and pays Lucy.  On Tuesday, Lucy delivers the car and Sally discovers it is blue.  Sally sues under the Clifton ordinance alleging misrepresentation and can either (1) rescind the contract, or (2) recover the difference between the value of a blue car and the value of a red car—the two possible remedies for fraud.  Lucy's speech would not be protected.  Lucy could not claim she was not on notice that her conduct violated the ordinance, even if a previous case dealing with similar conduct had not yet been decided.  That is because Sally proved the elements of common law fraud, including that she *relied* on

Lucy's misrepresentation about the car's color.  *See supra* part II (naming two ways in which a defendant may have notice under vague consumer protection statutes).

Finally, imagine Clifton has just enacted the same ordinance; it is new so there are no prior decisions to define prohibited conduct.  A state court has interpreted the ordinance as not requiring a plaintiff to prove reliance (and therefore causation).  Lucy, now the owner of a car dealership that only sells blue cars, places an advertisement in the *Clifton Chronicle* that says, "Our cars are red hot!" accompanied by a cartoon picture of a red car.  Sally, who wants to purchase a red car, sees the advertisement and purchases a car over the phone only to later discover that it is blue.  Sally begins a class action against Lucy on behalf of everyone who has ever bought a car from Lucy's car dealership.  Because Lucy engaged in an unfair business practice and all her customers bought less valuable blue cars, Judge Franklin decides that Lucy's advertisement violated the ordinance and orders her to pay the difference in value between a red car and a blue car to every class member.[23]

Where is the free speech problem here?  For one, Lucy was not on notice that her advertisement fell under the ambit of the ordinance.  Perhaps she thought she was merely puffing.  The ordinance used vague language, and neither of our two workarounds apply.  *See supra* part II.  Sally could not use a prior decision to prove

---

[23] In so holding Lucy liable, Judge Franklin would inherently need to find that Lucy engaged in unprotected misrepresentative commercial speech.

the advertisement was prohibited because the ordinance was new, and the common law analogy could not help because nobody had to prove reliance (and therefore causation).  This notice problem already implicates the Due Process Problem.  *See infra* part III.B.  The First Amendment concern comes due to the almost certain consequence of Judge Franklin's ruling.

In engaging in speech that Judge Franklin would later deem violated the statute and fell outside the First Amendment's protection, what sanction did Lucy incur?  She was not merely told to stop through a cease and desist order.  *See supra* part I.A.  That would be fine.  She was not even held liable for the actual damage her advertisement caused Sally.[24]  Rather, Lucy had to pay damages to all of her customers irrespective of whether (1) they saw the advertisement, (2) they thought the advertisement was advertising red cars, or (3) they wanted a red car.  Class member Snoopy could recover damages because he bought a blue car from Lucy *despite* having never seen the advertisement *and* the fact that he shopped at Lucy's car dealership specifically because he wanted a blue car.  This is troubling in and of itself, as part of the Due Process Problem.  *See infra* part III.B.  But now we get to the Free Speech Problem.

What would a rational businessperson do if faced with a vague statute that might penalize her advertising with runaway damages liability to an unforeseeable number of plaintiffs?  Not

---

[24] A question remains whether this scenario would also implicate the Due Process Problem.

advertise, or at least severely restrict her advertising. So, while the ordinance on its face only prohibits unprotected speech, any rational businessperson would stand so far away from the ill-defined line between outlawed advertising and permissible advertising—thus chilling protected speech—to avoid the potentially catastrophic consequences of damages to all. This is the Free Speech Problem.

All the consumer protection statutes at issue in this case touch speech in some way by barring misrepresentation—either explicitly like Missouri, or implicitly like the other four statutes. While, again, forbidding such misrepresentative commercial speech generally falls within the ambit of a state's police power, a court that allows unforeseeable damages to unforeseeable plaintiffs through a reliance-less cause of action, in effect, prophylactically prohibits *potentially* misleading—and therefore protected—speech. And chilling that extra, protected speech goes well beyond that necessary to further a state's interest in protecting consumers from misrepresentation. *See Cen. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 569–70, 100 S. Ct. 2343, 2353 (1980).

*B.*

Though we have already touched on the Due Process Problem, let us hit a couple more points.

Class actions can be an efficient method by which to resolve a great quantity of legal claims. A class action can benefit putative plaintiffs by allowing many individuals with meritorious claims—though perhaps small—to pool their resources to vindicate their

injuries against a common defendant.  A class action can benefit defendants by allowing them to defend against many similar legal claims in one fell swoop as opposed to defending individually against death by a thousand cuts.

But efficiency is not the be-all-end-all, especially in a justice system.  In addition to the First Amendment interests explored in part III.A, *supra*, interests in efficiency must yield to due process concerns when they arise.  *See Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1218 (11th Cir. 2017) (en banc) (Tjoflat, J., dissenting) (highlighting the due process dangers that serve as a backstop to the efficiency of issue and claim preclusion); *see also Rollins, Inc. v. Butland*, 951 So. 2d 860, 874–75 (Fla. 2d Dist. Ct. App. 2006) (explaining that (a) "considerations of administrative convenience do not trump the class action defendant's right to due process of law" and (b) the argument that "ordinary standards concerning rules of evidence, burdens of proof, or proof of the elements of a cause of action must be relaxed in the class action context" is circular because it "assumes what remains to be proved: that the individual members of the putative class have a right to recovery in the first place" (citation omitted)).

The predominance requirement of Federal Rule of Civil Procedure 23(b)(3) serves as one layer of protection for the due process rights of class action defendants.[25]  If a class sues under a claim

---

[25] "A class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action

that—by its elements—ought to require too much of an individual inquiry, a class action that reaches a jury risks ironing over the differences within a class.  These ironed-over differences may have made the difference between one class member's successful prima facie case (like Sally's) from another class member's failed one (like Snoopy's).  This ironing, in effect, leaves defendants liable to (1) plaintiffs who would not have a meritorious individual claim against the defendant and (2) plaintiffs who were simply not held to their burdens of proof and persuasion due to their riding the coattails of other plaintiffs.

Much as a court eliminating causation from the traditional elements of negligence would deprive a defendant of property without notice—thus denying the defendant due process—so would excusing the reliance (and therefore causation) element in these state consumer protection statutes.  All a plaintiff needs to prove under a causation-less cause of action is that the defendant committed an act prohibited by the statute and the plaintiff suffered some sort of recoverable injury, whether or not any causal connection exists between the two.  That would be like if defendant Linus—under a duty not to leave his blanket on the ground for fear of creating a slip hazard and yet breaching that duty—was held

---

is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

liable to plaintiff Schroeder for his injury sustained from a falling piano on the other side of Clifton.[26]

### C.

Any elimination of a reliance (and thus causation) element in a Misrepresentative Advertising Class Action also poses a Standing Problem.  It is hard for me to believe that—especially after *TransUnion*—any class action scheme in a Misrepresentative Advertising context can pass muster under Article III standing law if the cause of action contains no reliance or causation requirement or allows a class to ride the coattails of named class representatives as to reliance or causation.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).  While two of the three standing requirements allow a plaintiff to enter the courthouse on probabilities, one does not.  The Supreme Court identified three standing requirements: (1) "that the injury was *likely* caused by the defendant"; (2) "that the injury would *likely* be redressed by judicial relief"; but (3) that the plaintiff "suffered an injury *in fact* that is concrete, particularized, and actual or imminent."  *Id*. at 2203 (emphasis added) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992)).  Therefore, an objective test that asks something along the lines of, "is the defendant's conduct *likely* to cause injury to the reasonable consumer" cannot excuse a standing requirement of actual injury in a backward-looking damages suit in federal court.

---

[26] Add to this hypothetical the idea that it may not be clear that Linus had such a duty, and the Due Process Problem only grows.

22-10575  T<span></span>JOFLAT, J., Concurring and Dissenting in Part        25

Contrast such a suit to an objective test for a forward-looking injunction.  *See City of L.A. v. Lyons*, 461 U.S. 95, 105, 103 S. Ct. 1660, 1667 (1983) (evaluating injunctive standing using a "likely to suffer future injury" standard).  For forward-looking relief, only one plaintiff need show an actual injury because, with injunctive relief, whether the suit is brought by one plaintiff or one million plaintiffs, the injunction preventing future conduct remains the same.

Any use of the state legislative power does not solve the standing problem.  "[E]ven though 'Congress [or a state legislature] may elevate harms that exist in the real world before [the legislature] recognized them to actionable legal status, it may not simply enact an injury into existence.'"  *TransUnion*, 141 S. Ct. at 2205 (internal quotations omitted) (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).  And the Supreme Court has already rejected the idea that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341, 136 S. Ct. 1540, 1549 (2016).  "[T]he public interest that private entities comply with the law cannot 'be converted into an individual right by a statute that denominates it as such, and that permits all citizens . . . to sue.'"[27] *TransUnion*, 141 S. Ct. at 2206 (quoting *Lujan*, 504 U.S. at 576–77, 112 S. Ct. at 2145).

---

[27] This particular point goes to the heart of the justification for the California statutory claim as discussed *infra* part V.D.

Further, vindicating the public interest ought to be in the hands of a democratically accountable enforcing party, such as a state attorney general, not private parties with no standing. "Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* at 2207 (citation omitted).

Importantly for a Misrepresentative Advertising *Class Action*, "[e]very class member must have Article III standing in order to recover individual damages." *Id.* at 2208. In other words, unnamed class members cannot get into court using the named plaintiff's ticket.[28]

### D.

Finally, the way these statutory causes of action are presented in the Majority opinion presents a Separation of Powers Problem.

Each and every statutory cause of action—Florida, New York, Washington, and Missouri—requires causation as an element. *See City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th Dist. Ct. App. 2008) (requiring "causation"); *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (requiring the plaintiff to have sustained an injury "as a result" of defendant's act or practice); *Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1221 (Wash.

---

[28] This also strikes at the heart of the California statutory claim. *See infra* part V.D.

22-10575  T JOFLAT, J., Concurring and Dissenting in Part        27

2019) (requiring "a causal link between the act and the injury"); *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (requiring the plaintiff's injury to occur "as a result of" a violation of the statute); *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 887 (Cal. 2011) (requiring causation for standing under the UCL).

As shown in part II, *supra*, the inherent causal mechanism in a misrepresentation claim is reliance.  Therefore, any state court that announces that the respective state statute does not require a showing of reliance must have done one of two things.

One, it might be that the case before that state court, though brought under the state consumer protection statute, was not a misrepresentation case.  Perhaps then, a causal mechanism other than reliance might suffice and the plaintiff in fact does not need to prove reliance.  If so, an announcement that the statute does not require a showing of reliance has nothing to say about this case—a Misrepresentative Advertising Class Action—where reliance *is* the causal mechanism.

Two, the state court might have usurped the state legislature's power and rewrote the statute.  Separation of powers principles in all five of the states at issue here forbid such a usurpation. *See Hawkins v. Ford Motor Co.*, 748 So. 2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language."); *In re Chase Nat'l Bank of City of N.Y.*, 28 N.E.2d 868, 871 (N.Y. 1940) ("[I]t is not within the province of this court to rewrite the enactments of the Legislature."); *City of Charleston ex rel. Brady v. McCutcheon*, 227 S.W.2d 736, 739 (Mo. 1950) ("To so rewrite this

statute would be but judicial usurpation of the legislative function. That we cannot do."); *Millay v. Cam*, 955 P.2d 791, 795 (Wash. 1998) ("Courts do not amend statutes by judicial construction . . . nor rewrite statutes to avoid difficulties in construing and applying them." (internal quotation marks and citations omitted)); *Seaboard Acceptance Corp. v. Shay*, 5 P.2d 882, 885 (Cal. 1931) ("This court cannot . . . in the exercise of its power to interpret, rewrite the statute.").

This Separation of Powers Problem is further exacerbated by the Free Speech Problem.  While state legislatures can exercise their police power to proscribe unprotected speech, if the government has an interest in protecting the populace from some sort of injury, it is a completely different matter if courts, which do not possess police power, do so.  *Compare Gitlow v. New York*, 268 U.S. 652, 670, 45 S. Ct. 625, 631 (1925) (finding that an enactment by the state legislature did not exceed the police power and violate the defendant's free speech right), *with Cantwell v. Connecticut*, 310 U.S. 296, 307–308, 60 S. Ct. 900, 905 (1940) (coming to the opposite conclusion because a state court rather than the legislature attempted to engage in the police power by weighing the state's interest against the First Amendment interest).

As stated in part III.A, *supra*, in reading out the causation element of these statutes on its own initiative, the state court creates a prophylactic ban on protected and unprotected speech alike out of whole cloth.  If a state desires to penalize unprotected speech, the state *legislature* can craft a prohibition by utilizing the police

power. But the state *court* cannot so exercise the police power. *See Gandy v. Borras*, 154 So. 248, 249 (Fla. 1934) ("When a subject lies within the police power of the state, debatable questions as to reasonableness of the exercise of the power are not for the courts but for the Legislature."); *People v. Munoz*, 172 N.E.2d 535, 539 (N.Y. 1961) ("It is for the courts to determine, not how the police power should be exercised, but whether there is reasonable relation between the statute or ordinance and the object sought to be attained."); *Star Square Auto Supply Co. v. Gerk*, 30 S.W.2d 447, 462 (Mo. 1930) ("The propriety, wisdom, and expediency of legislation enacted in pursuance of the police power is exclusively a matter for the Legislature. The single question which lies within the province of the judiciary for its determination is whether the Legislature, in the exercise of the police power, has exceeded the limits imposed by the Constitution, federal or state."); *Granat v. Keasler*, 663 P.2d 830, 832 (Wash. 1983) (implying that the police power rests outside the judiciary because "[a]n exercise of the police power . . . is subject to judicial review"); *Frost v. City of L.A.*, 183 P. 342, 345 (Cal. 1919) ("The Legislature is possessed of the entire police power of the state . . . .").

Normally, the legislature exercises the police power, and the courts serve as backstops to ensure the legislature's use of the power does not violate the state or federal constitutions. The situation we have here turns this on its head. In reading out a necessary element of a Misrepresentative Advertising Class Action, courts usurp the police power and do so not to *remedy* constitutional deficiencies, but to *create* them.

## IV.

With these four constitutional problems, how could these six Misrepresentative Advertising Class Actions go forward? These four constitutional problems, *see supra* part III, can remain hidden under the hood if a court adopts state court language wholesale. The Majority opinion illustrates this point. The Majority frames the predominance inquiry of the state laws at issue here as asking "(1) whether those laws require proof of reliance, (2) if so, whether they permit reliance to be presumed, and (3) if so, under what circumstances." Maj. Op. at 2.

The Majority correctly sets off on the proper inquiry under the predominance requirement:

> The first step in assessing predominance is to "identify the parties' claims and defenses and their elements" and to categorize "these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Id.* A common issue is one that will likely be proved using the same evidence for all class members; an individualized issue, by contrast, is one that will likely be proved using evidence that "var[ies] from member to member."

*Id.* at 7 (quoting *Brown v. Electrolux Homes Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016)). The Majority also correctly states that if the plaintiffs had to prove reliance, that would be "a very individualized inquiry, the kind that would predominate over other common questions in a class action." *Id.* at 10. For the reasons discussed in part III, *supra*, the Majority errs by not essentially ending its analysis

there.  To recap, in a Misrepresentative Advertising Class Action, (1) causation inherently requires a showing of reliance, (2) each statute (and the California common law claim) requires a showing of causation, and (3) no state court could possibly possess the power to eliminate that causation element.

Instead of ending its analysis, however, the Majority splits the claims before us into three buckets:  Bucket One—the Florida, Missouri, Washington, and New York statutory claims—includes the class certifications which the Majority affirms; Bucket Two— the Texas statutory claim and Tennessee, Washington, and New York common law fraud claims—includes the class certifications which the Majority reverses;[29] and Bucket Three—the California statutory and common law claims—which the Majority remands for further factual findings.  Maj. Op. at 16.  In apparent reference to all three buckets, the Majority suggests that "a (perhaps *the*) key issue in this case is whether each of the several state-law causes of action that plaintiffs have alleged permits a presumption of reliance and, if it does, under what circumstances."  *Id.* at 10 (emphasis in original).

But the Majority's analyses of the Bucket One claims do not rely on a presumption because that bucket "comprises state causes of action that don't require proof of reliance."  *Id.* at 16.  It therefore appears a presumption analysis only plays a part in the Buckets Two and Three analyses.  *Id.* at 20–25.  As to the Bucket One

---

[29] Again, I agree with the Majority's disposition of the claims in Bucket Two.

claims, in a Misrepresentative Advertising Class Action, causation inherently requires reliance.  *See supra* part II.B.  And just as state courts cannot pluck the causation element out of a statutory cause of action, *see supra* part III.D, the Majority cannot do the same in this Court without itself violating the four constitutional principles outlined in part III, *supra*.

What about the two California claims in Bucket Three?  The Majority identifies the Bucket Three claims as those causes of action that rely on the presence of a presumption.  Maj. Op. at 23. Presumptions come in two flavors: what I will call classical and conclusive.  A classical presumption, which generally applies to a fact the plaintiff must prove to establish a claim, temporarily excuses the plaintiff's burden of proving such a fact to establish a claim sufficient to withstand a motion for judgment as a matter of law at the close of the plaintiff's case.  The defendant can rebut the presumption and, if successful, the plaintiff has the burden of proving the presumed fact at trial.

The classical presumption could not possibly apply to any of the claims asserted in this case.  The classical presumption works when a defendant possesses evidence the plaintiff needs to establish a prima facie case.  Therefore, the plaintiff needs evidence of the presumed fact to avoid a judgment as a matter of law.  The classical presumption temporarily relieves the plaintiff until the defendant—the party with control over the evidence necessary to prove or disprove the presumed element—rebuts the presumption.

A conclusive presumption, on the other hand, operates as a matter of policy—if enacted in a statute itself—or interpretation—if a court creates the presumption through a judicial decision "declaring" common law—and serves as a prophylactic.  Essentially, because it permanently relieves a party of the burden to prove an element, the conclusive presumption erases the element.  For example, if a cause of action requires (1) a false statement, (2) an economic injury, and (3) reliance, a judicially created conclusive presumption as to reliance makes a defendant liable whether or not a plaintiff relied, despite the statute requiring a showing of reliance.  The constitutional problems, therefore, that accompany a court reading out an element of a claim discussed in part III, *supra*, all apply to a judicially created conclusive presumption as well.

With the conclusive presumption a non-starter, what about the classical version?  The classical presumption makes absolutely no sense in the context of reliance.  Between the purchasing customer and the manufacturing seller, who is more likely to possess evidence of the reliance or non-reliance of any given purchaser?  Obviously, the purchaser him or herself.  What could the seller—defendant Ford in this case—possibly have to offer the factfinder by way of getting to the truth of whether a plaintiff relied on alleged misrepresentations?  A rebuttable presumption also does little to change these claims into those where common issues predominate.  It only changes the order of proof.  The defendant will need to produce individual evidence to rebut the presumption for each individual class member and, if the defendant succeeds, each class member will then need to individually prove reliance at trial.

Even if the burden to prove or disprove reliance properly and temporarily shifted to Ford going forward with the evidence, Ford would need to rebut—or at least have the opportunity to rebut—reliance for each individual plaintiff.  This would still make a class action inappropriate and unmanageable because each individual case would still need to be tried by a jury to determine (1) if Ford presented sufficient evidence to rebut the presumption, and (2) if each individual plaintiff ultimately proved his or her case.[30]

So, the Majority, in focusing on a presumption of reliance for the Bucket Three claims, must mean a conclusive presumption. As for the California statutory claim, a presumption—let alone a conclusive presumption—does not derive from the statute.  *See supra* part I.E.  Rather, "Courts applying California law" have declared the statute implies it.  Maj. Op. at 24.  Likewise, the Majority indicates that the California common law claim includes reliance as an element, but that courts apply a presumption to those common law claims as well.  *Id.* at 25.  The Majority says that they do this where "the same material misrepresentations have actually been communicated to each member of a class."  *Id.* (quoting *Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993)).  The fact that courts interpreting California law had to create and apply a

---

[30] In addition to a potential trial being unmanageable, discovery would be an unmitigated mess.  At bottom, with a rebuttable presumption, either the plaintiffs will have to produce evidence of each individual class member's reliance, or the defendant will have to depose each individual class member *and* each individual class member would have to produce evidence of reliance once the defendant rebuts the presumption.

presumption (thus excusing proof of reliance) suggests that the default prior to the court-created presumption, even for the common law misrepresentation claim, required plaintiffs to plead and prove reliance. Thus, the judicial elimination of an element—despite being labelled a presumption—runs afoul of the four constitutional problems explained in part III, *supra*.[31]

## V.

The Majority's analysis integrates two errors: (1) it interprets state cases about non-Misrepresentative Advertising Class Actions as issuing guidance (though in dicta) for decisions involving Misrepresentative Advertising Class Actions; and (2) it allows state court cases that involve Misrepresentative Advertising Class Actions but that do not wrestle with the four constitutional problems, *see supra* part III, to bind this Court, when we should refuse to give full faith and credit to those decisions. The Majority cites other federal courts and state courts interpreting the consumer protection statutes in this case and, at first glance, they seem to say that for the Florida, New York, Washington, Missouri, and California statutory claims and the California common law claims, there is no need for each individual plaintiff to plead and prove individual reliance. But these prior cases do not cure the four constitutional ills discussed in part III, *supra*.

---

[31] Of course, the Separation of Powers Problem does not exist for the common law cause of action, but the Standing, Due Process, and Free Speech Problems do.

Normally, we defer to state courts in interpreting their own state law.  But we need not give credit and follow state court cases that violate the United States Constitution.  "A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment."  *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482, 102 S. Ct. 1883, 1898 (1982) (footnote omitted); *see also* U.S. Const. art. IV, § 1; *Old Wayne Mut. Life Ass'n v. McDonough*, 204 U.S. 8, 15, 27 S. Ct. 236, 238 (1907) ("The constitutional requirement that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state is necessarily to be interpreted in connection with other provisions of the Constitution, and therefore no state can obtain in the tribunals of other jurisdictions full faith and credit for its judicial proceedings if they are wanting in the due process of law enjoined by the fundamental law.").  If such is the case for a constitutionally infirm state court *judgment*, how much more so for constitutionally infirm state court *precedent*?  In fact, this Court is duty-bound by the United States Constitution to inquire whether we ought to afford a case full faith and credit.  *See Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1288 (11th Cir. 2017) (en banc) (Tjoflat, J., dissenting).  If this Court ought not to give credit, and it does, then *this Court* violates the Constitution in the ways discussed in part III, *supra*.

The remainder of part V looks to each state and the case or cases where the Majority finds either a state law presumption of reliance (for Bucket Three) or an elimination of a reliance

requirement (for Bucket One).  Then, for each state court case, I
provide an explanation why either (1) the proposition the Majority
cites the case for is dicta due to the case being so different from the
Misrepresentative Advertising Class Action we have here, or (2) the
state court case was constitutionally deficient and should therefore
not be followed, or (3) both.

*A.*

We begin with New York.  The Majority correctly identifies
a claim under N.Y. Gen. Bus. Law § 349(a) as having three ele-
ments: "(1) the defendant's challenged acts or practices must have
been directed at consumers, (2) the acts or practices must have
been misleading in a material way, and (3) the plaintiff must have
sustained an injury as a result."  Maj. Op. at 17–18 (quoting *Cohen
v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)).  The
Majority also correctly notes that private actions under § 349—at
least as interpreted by the Second Circuit[32]—do not require proof
of actual reliance.  *Id.* at 18 (quoting *Pelman ex rel. Pelman v. McDon-
ald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citing *Stutman v. Chem.
Bank*, 731 N.E.2d 608, 611 (N.Y. 2000))).

Does *Stutman* control here?  In short, no.  In *Stutman*,

[The] plaintiffs allege[d] that defendant violated sec-
tion 349 by promising . . . that there would be no

---

[32] We, of course, need not follow a sister circuit's interpretation of state law
even if said state is encompassed by that sister circuit.  The only potentially
binding precedent for this Court (other than our own and that of the United
States Supreme Court) are decisions rendered by the state's own courts.

> "prepayment charge," but then assessing a $275 "at-
> torney's fee" when plaintiffs sought to refinance their
> loan.  Plaintiffs contend that the $275 fee was a "pre-
> payment charge" in disguise and that the note was de-
> ceptive for not revealing that fee.

*Stutman*, 731 N.E.2d at 612.  The New York Court of Appeals rec-
ognized that while a § 349(a) cause of action has no reliance ele-
ment, it does have a causation element.  *See id.* ("The plaintiff, how-
ever, must show that the defendant's material deceptive act *caused*
the injury." (emphasis added) (internal quotations and citation
omitted)).[33]

    The New York court stated that the Stutmans and their as-
sociated class members "allege[d] that defendant's material decep-
tion *caused* them to suffer a $275 loss" by "alleg[ing] that because
of defendant's deceptive act, they were forced to pay a $275 fee that
they had been led to believe was not required."  *Id.* at 612–13 (em-
phasis added).  According to the New York court, they did not also
need to "additionally allege that they would not otherwise have
entered into the transaction."  *Id.* at 613.  For the Stutmans' claim,
causation and reliance could be separated.  In a Misrepresentative
Advertising Class Action, however, causation inherently requires

---

[33] The *Stutman* court also stated, "Reliance and causation are twin concepts,
but they are not identical.  In the context of fraud, they are often intertwined."
*Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000).  Even the *Stutman*
court implicitly recognized, therefore, that when the § 349(a) claim sounds in
fraud, like in a Misrepresentative Advertising Class Action, the causation re-
quirement becomes intertwined with a showing of reliance.

22-10575  Tjoflat, J., Concurring and Dissenting in Part        39

reliance.  *See supra* part II.  *Stutman*'s general statements about reliance cannot bind this Court now.

Further, the entire reliance discussion in *Stutman* is dicta.  As soon as the New York court declared that the plaintiffs adequately alleged causation, it *held*, "Nevertheless, we uphold the Appellate Division's dismissal of plaintiffs' claim, for a different reason: plaintiffs have failed to show that defendant committed a deceptive act." *Stutman*, 731 N.E.2d at 613.  The Majority's look to New York state court precedent does not change the analysis in parts I–III, *supra*. Individual issues will predominate for the New York claim class because each plaintiff will need to individually establish reliance.

*B.*

Let us move on to Missouri.  The MMPA requires a plaintiff to prove that he has "(1) purchased merchandise (which includes services) from defendants; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the [MMPA]." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (citing *Hess v. Chase Manhattan Bank, USA*, 220 S.W.3d 758, 773 (Mo. 2007)).  Just as with the New York statute, "there is no denying that causation is a necessary element of an MMPA claim." *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008).

*Murphy* likely could not guide this Court even without any concern over not following constitutionally deficient state court cases.  In *Murphy*, the intermediate appellate court in Missouri reversed the trial court's dismissal of Murphy's MMPA claim that

asserted the defendant misrepresented that "its cupcake mix was 'all natural' when it contained the ingredient of sodium acid pyrophosphate (SAPP), a chemical that acts as a leavening agent and is found in commercial baking powders." *Murphy*, 503 S.W.3d at 310. In its reasoning, the *Murphy* court declaims a reliance requirement and uses an objective test.[34] *Id.* at 311–12.  But the court made such declarations not in discussing causation or reliance, but rather in discussing the primary question on appeal: whether the defendant actually violated the MMPA.  *Id.* at 312 ("[M]ore discovery is required regarding whether SAPP is an artificial or natural ingredient, whether SAPP is ordinarily expected to be included in such a cupcake mix, whether an *ordinary consumer* would be misled by the term 'all natural,' and whether labeling the mix as 'all natural' was deceptive." (emphasis added)).

    In actually addressing the "ascertainable loss" prong, the *Murphy* court briefly remarked that Murphy adequately pled an ascertainable loss under the "benefit-of-the-bargain rule."  *Id.* at 313.  In so doing, however, the *Murphy* court explicitly recognized that the "plaintiff's loss should be *a result of* the defendant's unlawful practice."  *Id.* (emphasis added).  In a Misrepresentative Advertising Class Action, such causation requires reliance.  *See supra* part II.  I also note that, though Murphy filed the complaint as a putative

---

[34] The *Murphy* court specifically states, a "consumer's reliance on an unlawful practice is not required under the MMPA."  *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (citing *Hess v. Chase Manhattan Bank, USA*, 220 S.W.3d 758, 774 (Mo. 2007)).

class action, the opinion suggests that no court had yet analyzed whether a putative class could be certified and therefore no court had yet wrestled with the predominance questions we wrestle with here. Therefore, *Murphy* seems to be inapposite, especially in its adoption of a reliance-less causation standard and objective test for causation. Insofar as *Murphy is* on point, however, we need not give it weight as the court would have overstepped constitutionally by not requiring a showing of reliance (and thus causation) in a misrepresentation case.

Further, I do not think the benefit-of-the-bargain rule *can* apply to a case like that which the instant plaintiffs allege against Ford. The Majority notes that "state courts in Missouri have held that the injury- and causation-related elements of an MMPA claim can be established class-wide under what those courts call a 'benefit-of-the-bargain rule.'" Maj. Op. at 20 (citing *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714–15 (Mo. Ct. App. 2009)).[35] While that may work for some types of MMPA claims, in my view the "benefit-of-the-

---

[35] The benefit-of-the-bargain theory mirrors one of two options for damages in a fraud action: contract recission or the difference between the value bargained for and the value received. Even if a fraud cause of action could go forward as a class action, the contract recission option would be unmanageable because it would require all the unnamed plaintiffs to return their cars at the end of successful litigation. The benefit-of-the-bargain option is more manageable, but only if the raw value received (value of car minus price paid) was uniform among the class. Further, a benefit-of-the-bargain theory, when properly applied, can perhaps solve the damages predominance problem, but I am not convinced that it solves the causation predominance problem where, as here, the causal mechanism is reliance.

bargain" theory does not work when it comes to products like cars and houses.  Unlike most other products, the final price of a car or home results from negotiations between a buyer and a seller.  The price is not taken as a given like with most products one picks up at the local big box store.  For plaintiffs to show they did not receive the benefit of their bargain, they would need to show what they specifically bargained for with the seller, here, the Ford dealership.  This would cause the same predominance problems as an individual reliance requirement.  And if we were to allow a presumption that the plaintiff did not receive the benefit of their bargain without giving Ford a chance to respond or rebut, we would violate Ford's due process rights.[36]  Therefore, Missouri case law, as cited by the Majority, does not change the analysis in parts I–III, *supra*.  Individual issues will predominate for the Missouri claim class because each plaintiff will need to individually establish reliance.

## C.

Now, we move to Washington.  Even the Majority recognizes that such a Washington statutory claim explicitly requires "a

---

[36] It is a closer call whether a benefit-of-the-bargain theory or price-inflation theory could solve the predominance conundrum if all Ford Shelby GT350 Mustangs sell in Missouri for $50,000, but track-ready Shelbys go for $55,000.  In that scenario, the inflated price is clearly $5,000—an extra premium every purchaser pays.  But cars are different.  Some pay sticker price.  Some pay less.  There is no indication that every purchaser paid the same amount of price premium here, however.  Therefore, causation, injury, and damages, are all still individualized inquiries, complicated by individual negotiations, representations, and reliance.

22-10575  T JOFLAT, J., Concurring and Dissenting in Part         43

causal link between the act and the injury." *Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1221 (Wash. 2019); Maj. Op. at 18.  The Washington Supreme Court adopted a proximate cause standard that requires a plaintiff to "establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Schnall v. AT&T Wireless Servs., Inc.*, 259 P.3d 129, 137 (Wash. 2011) (emphasis added) (quoting *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007)). This sounds like the Washington high court recognizes that in a Misrepresentative Advertising Class Action, reliance would be required to prove causation.

The Majority relies on *Thornell v. Seattle Serv. Bureau, Inc.* for the proposition that reliance is not necessarily required to make out a cause of action under Washington's consumer protection statute. 363 P.3d 587 (Wash. 2015).  This case involved answering two certified questions from the United States District Court for the Western District of Washington.  First, the Washington court said the Washington consumer protection act "allows a cause of action for a plaintiff residing outside Washington to sue a Washington corporate defendant for allegedly deceptive acts." *Id*. at 589.  Any discussion of this point cannot have any bearing on the instant analysis except via dicta.  Second, the Washington court said, "the [consumer protection statute] supports a cause of action for an out-of-state plaintiff to sue an out-of-state defendant for the allegedly

deceptive acts of its in-state agent." *Id.*  Again, any discussion on this holding relevant to *our* discussion would have to be in dicta.[37]

Because the Washington consumer protection claim requires a showing of causation and causation means reliance in a Misrepresentative Advertising Class Action, *see supra* part II, the Washington class claim fails the predominance requirement. Washington case law, as cited by the Majority, does not change the analysis in parts I–III, *supra*.  Individual issues will predominate for

---

[37] In dicta, the *Thornell* court cites to *Indoor Billboard* for the proposition that reliance is not required to make out a claim under the Washington consumer protection statute.  In that case, plaintiffs alleged that the defendant "engaged in an unfair or deceptive act or practice by assessing its Washington local exchange customers a surcharge known as a presubscribed interexchange carrier charge." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 12 (Wash. 2007).  The Washington court adopted a proximate cause standard.  *Id.* at 22.  In so doing, the court "reject[ed] [the plaintiff's] argument that causation may be established merely by a showing that money was lost." *Id.* at 21.  Further, the court—though having before it a class action—did not address how such a proximate cause standard fit in with the predominance requirement.  The court also did not necessarily indicate whether the plaintiffs satisfied the proximate cause test, it just reversed summary judgment because proximate cause is for the finder of fact to decide.  *Id.* at 22.

Finally, even though the Washington court characterized the *Indoor Billboard* claim as an affirmative misrepresentation claim, it is not analogous to the instant facts.  The extra charge alleged to violate the statute in *Indoor Billboard* is more akin to a fraud on the market cause of action, whereas the instant plaintiffs' claims against Ford are akin to traditional fraud.  Either way, to the extent *Indoor Billboard* is analogous to the instant facts, we need not give weight to constitutionally deficient state court precedent.

the Washington claim class because each plaintiff will need to individually establish reliance.

*D.*

The California statutory claim's deficiency cannot be cured by additional factual findings on remand. The Majority points to a possible court-created presumption of reliance where "the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020); Maj. Op. at 24. But the instant case, at bottom, involves the plaintiffs asserting that Ford falsely or misleadingly advertised the Shelby GT350. Such a claim is encapsulated by the "untrue or misleading advertising" prong of the UCL. Cal. Bus. & Prof. Code § 17200. This sounds in fraud. As the Majority acknowledges, fraud requires reliance. Maj. Op. at 20–23. In creating "'a conclusive presumption' of reliance in UCL cases," *Walker*, 953 F.3d at 630 (citation omitted), as applied to a claim sounding in fraud, the court effectively eliminates the causation element in the statute, *see supra* parts II, IV, causing the four constitutional problems discussed in part III, *supra*.

The supposed conclusive presumption of reliance derives from a case in which the Supreme Court of California constitutionally overstepped. *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009). In that iteration of the wide-ranging tobacco class action litigation, the California high court held (1) "that standing requirements [under the UCL] are applicable only to the class representatives" and (2) "a class representative proceeding on a claim of misrepresentation

as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Id*. at 25–26.  The California court, quoting its previous cases, concluded, "[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Id*. at 29 (alteration in original) (internal quotation marks and citation omitted).  This probabilistic objective test would be troubling by itself, but the court goes on, again quoting itself, "A UCL action is equitable in nature; damages cannot be recovered. . . . We have stated under the UCL, [p]revailing plaintiffs are generally limited to injunctive relief and restitution." *Id*. (alteration in original) (internal quotation marks and citation omitted).  The California court seems to miss the difference between forward-looking injunctive relief and backward-looking damages, and creates Due Process, Standing, and Free Speech Problems for future California class litigants.

The court continues by differentiating a fraudulent business practice UCL claim from common law fraud.  "None of these elements[, including reliance,] are required to state a claim for *injunctive relief* under the UCL." *Id*. (emphasis added) (internal quotation marks and citation omitted).  Despite recognizing that an objective test springs from relief under the UCL being injunctive, the *Tobacco II* court appears to adopt the objective test for damages actions as well, at least as far as unnamed plaintiffs go:

22-10575   TJOFLAT, J., Concurring and Dissenting in Part        47

> Similarly, the language of section 17203 with respect
> to those entitled to restitution—"to restore to any
> person in interest any money or property, real or per-
> sonal, which *may have been acquired*" . . . by means of
> the unfair practice—is patently less stringent than the
> standing requirement for the class representative—
> "any person who has suffered injury in fact and has
> lost money or property *as a result of* the unfair compe-
> tition." . . . This language, construed in light of the
> "concern that wrongdoers not retain the benefits of
> their misconduct" . . . has led courts repeatedly and
> consistently to hold that relief under the UCL is avail-
> able without individualized proof of deception, reli-
> ance and injury.

*Id.* at 35 (emphases in original) (citations omitted).  Even if the Cal-
ifornia court correctly interpreted the statute as a linguistic mat-
ter,[38] excusing such proof of reliance runs afoul of the four consti-
tutional problems discussed in part III, *supra*.

Named class members must still prove actual reliance.  *To-
bacco II*, 207 P.3d at 39.  Excusing the *unnamed* class members from
this burden causes a practical problem in addition to the constitu-
tional problems.  How is an unnamed class member to obtain

---

[38] I note that the cases the Supreme Court of California cites for this proposi-
tion were all decided before the California citizens revised the UCL in 2004 to
"eliminate frivolous unfair competition lawsuits" and "prevent uninjured pri-
vate persons from suing for restitution on behalf of others" by adding the
standing requirement.  *In re Tobacco II Cases*, 207 P.3d 20, 31, 33 (Cal. 2009)
(internal quotations and citation omitted).

restitution without an individual inquiry into injury and damages? For this reason, California's interpretation of the UCL is erroneous, at least as applied to a misrepresentation case like we have here. For all the reasons just discussed, we should not follow the California court's lead in not requiring an individual showing of reliance because such a holding would violate the United States Constitution. Because California case law, as cited by the Majority, does not change the analysis in parts I–III, *supra*, individual issues will predominate for the California statutory claim class because each plaintiff will need to individually establish reliance.

I briefly note that, even without the Separation of Powers Problem, the same reasoning above applies to the California common law fraud claim. Even California courts recognize that "there is no doubt that reliance is the causal mechanism of fraud." *Tobacco II*, 207 P.3d at 39. For the reasons discussed above, California courts cannot constitutionally skirt this required element of fraud by deploying a conclusive presumption. *See Mirkin v. Wasserman*, 858 P.2d 568, 572 (Cal. 1993) (requiring actual reliance for a common law deceit cause of action). Therefore, this claim should also be reversed.

*E.*

1.

Finally, we come to the FDUTPA claim. This claim suffers from the same deficiencies as many of the other claims we have discussed. A FDUTPA claim requires a plaintiff to show (1) a deceptive act or unfair practice, (2) actual damages, and (3) *causation*.

22-10575    TJOFLAT, J., Concurring and Dissenting in Part        49

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th Dist. Ct. App. 2008)).  In a Misrepresentative Advertising Class Action, causation inherently requires a showing of reliance.  *See supra* part II.  Because Florida is geographically within this Circuit and we often have cause to interpret Florida law, the FDUTPA claim merits additional attention.  The Majority finds it dispositive that we said in *Carriuolo* that "a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue."  *Carriuolo*, 823 F.3d at 985 (internal quotations and citation omitted).  We have followed Florida case law in adopting this objective test for FDUTPA claims in a few other cases as well.  But all the Eleventh Circuit cases excusing a reliance requirement for a FDUTPA claim rely on the same erroneous interpretation of federal law, and this Court sitting en banc ought to reconsider our precedent.

To begin, almost all roads lead back to *Davis v. Powertel, Inc.*, a case out of the Florida First District Court of Appeal.  776 So. 2d 971 (Fla. 1st Dist. Ct. App. 2000).  In *Davis*, the plaintiffs alleged that Powertel sold cell phones without informing purchasers that the phones "had been programmed to work only with Powertel's wireless communication service," despite looking identical to cellphones from the same brands one could buy at other retail outlets.  *Id.* at 972.  The plaintiffs sought damages because they argued the nondisclosure of this modification "reduced the value of the phone in each case," even for those who actually desired Powertel's wireless service.  *Id.* at 973.  The court held that a class action for damages under the FDUTPA does not require "an allegation that

individual members of the class relied on the act or omission that is alleged to be unlawful." *Id.* at 972.  In reaching this conclusion, though, the *Davis* court incorrectly interpreted federal law.  Therefore, despite *Davis* being a Florida court's interpretation of Florida law—and in addition to the reasons discussed in part IV, *supra*, for not crediting state courts' unconstitutional statutory interpretations—the *Davis* court incorrectly interpreted federal law to interpret the FDUTPA and this federal Court need not have accepted the Florida court's incorrect interpretation of federal law.  I explain.

The FDUTPA explicitly requires courts to interpret the statute by giving "'due consideration and great weight' to Federal Trade Commission and federal court interpretations of section 5(a)(1) of the Federal Trade Commission Act." *Davis*, 776 So. 2d at 974 (quoting Fla. Stat. § 501.204(2)).  *Davis* says that because the FTC Act allows suits without proving reliance, so should the FDUTPA. *Id.* at 974–75 (citing three FTC cases in support of adopting an objective "likely to mislead" test).  That makes no sense.

The FTC Act only allows for forward-looking relief (initially) pursued by an arm of the government.  *See supra* part I.A.  The FDUTPA, however, allows for damages through a private right of action.  Fla. Stat. § 501.211(2).  Hypothetically, if a Florida court interpreted the FDUTPA, through its common law powers, to not require a showing of reliance where doing so does not run afoul of the part III constitutional problems—so, not in a misrepresentation context—we might be right in crediting the Florida court's interpretation in other non-misrepresentation cases.  But

22-10575   TJOFLAT, J., Concurring and Dissenting in Part       51

the *Davis* court did not use its common law powers.  It explicitly recognized that the FDUTPA guides courts to interpret the damages provision in light of the FTC Act and its federal interpretations.  *Davis*, 776 So. 2d at 974.  That would have been an impossible task.  How the FTC Act treats reliance has nothing to say about the FDUTPA's damages provision.

In sum, the FTC Act does not require reliance because suits are brought by the government and offer only prospective relief or civil damages.  Retrospective private damages are a completely different animal.  The FDUTPA does not deputize every Florida citizen to police false advertising violations.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021).  It only offers damages to remedy an injury.  Without causation (which requires reliance in a misrepresentation claim), there are no damages.  Therefore, the FTC Act is inapposite for interpreting the FDUTPA's damages provision, and the *Davis* court incorrectly interpreted federal law in interpreting the FDUTPA.  While we are bound by Florida courts' interpretations of Florida law, we are not bound to follow Florida courts' (incorrect) interpretations of federal law.  I therefore call on this Court sitting en banc to overturn those cases from our Circuit that relied on this erroneous interpretation to reach their conclusions.

### 2.

Unfortunately, our survey of the shaky ground on which *Davis* sits continues.  The *Davis* court cited a case from another Florida District Court and further confuses the difference between

damages and injunctive relief.  *Davis*, 776 So. 2d at 974 (citing *Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen.*, 761 So. 2d 1256 (Fla. 3d Dist. Ct. App. 2000)).  One can tell merely from the title of the case that *Millennium* was not a damages action by a private plaintiff, but rather an enforcement action by the Florida attorney general under the FDUTPA; a situation actually analogous to the actions under section five of the FTC Act.  But let us not judge a book by its cover or a case by its title.  In fact, *Millennium* was an appeal of a temporary injunction (equitable relief) in a case brought by the Attorney General's Department of Legal Affairs, not a private party.  *Millennium*, 761 So. 2d at 1257.  The Department ultimately sought only "an injunction, civil penalties and other statutory relief," not damages.  *Id.* at 1258.

Next, the Davis court enlisted the help of another case from Florida's Third District Court of Appeal for the objective test; this one seemingly more relevant.  *Davis*, 776 So. 2d at 974 (citing *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699 (Fla. 3d Dist. Ct. App. 2000)).  In *Latman*, the District Court of Appeal reversed denials of class certification.  *Latman*, 758 So. 2d at 700–01.  Plaintiffs, cruise ship passengers, alleged claims under the FDUTPA against defendant cruise lines related to "port charges" that cruise lines included in the ticket price and allegedly kept for themselves.  *Id.* at 701.  The *Latman* court analogized the cruise lines' alleged behavior to a hypothetical company before adopting an objective, reliance-free test under the FDUTPA.  *Id.* at 703.

> Suppose that a company systematically overcharges
> its customers on sales tax.  The hypothetical company

> pays the state the sales tax that it owes, and then keeps the overcharge for itself.
>
> We would not hesitate to say that an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid. That is so even though the consumers clearly were willing to pay the price charged—in the hypothetical example, they actually paid the sales tax overcharges—nor would it make a difference that the consumers paid no attention to the sales tax amount.

*Id.* This hypothetical differs vastly from a situation like the instant case where the alleged misrepresentation derived from multiple sources and a plaintiff class member may not have actually suffered damages depending on his or her intended use of the vehicle or negotiations prior to purchasing the vehicle. In fact, the analogous circumstance in the instant case would be if Ford charged 1% additional sales tax and pocketed that money. That deception would be uniform, and damages would be, if not uniform, easily ascertainable by a formula. The *Latman* court's broad adoption of an objective test under FDUTPA goes beyond its holding. *Id.* In fact, as the same district court of appeal has said in distinguishing *Latman*, the "FDUTPA requires proof of each individual plaintiff's actual (not consequential) damage and defendant's causation of damage, requiring evidence regarding how specific misrepresentations to individual [plaintiffs] decreased the value of their deal for a car." *Mia. Auto. Retail, Inc. v. Baldwin*, 97 So. 3d 846, 857 (Fla. 3d Dist. Ct. App. 2012). Therefore, insofar as *Davis* relies on *Latman* for

adopting the objective test to obtain FDUTPA damages, it extends the holding beyond what it can bare.[39]

The *Davis* court tries to strengthen its citation to *Latman* by pointing to one other jurisdiction where a court favorably cited the case and three other jurisdictions that also adopted an objective test under their respective consumer protection statutes.  History has not been kind to these citations.

First, *Davis* says Washington adopted *Latman*'s objective test.  *Davis*, 776 So. 2d at 974 (citing *Pickett v. Holland Am. Line-Westours, Inc.*, 6 P.3d 63 (Wash. Ct. App. 2000)).  However, after *Davis*, the Supreme Court of Washington reversed the *Pickett* court's "deciding the merits of the trial court's denial of class certification," which included that court's approval of *Latman*.  *Pickett v. Holland Am. Line-Westours, Inc.*, 35 P.3d 351, 360, 362 (Wash. 2001).

Second, *Davis* looks to an Illinois court's rejection of a reliance element in that state's consumer protection statute.  *Davis*, 776 So. 2d at 974 (citing *Oliveira v. Amoco Oil Co.*, 726 N.E.2d 51 (Ill. App. Ct. 2000)).  Again, after *Davis*, the Supreme Court of Illinois reversed the *Oliveira* court's decision, explicitly stating that the Illinois consumer protection statute requires something akin to reliance.  *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 161 (Ill. 2002).  The plaintiff in that case did not successfully allege the statute's

---

[39] Further, this Court has never cited directly to *Latman* for its objective FDUTPA test holding.

proximate cause element because he did not allege he was deceived by the advertisements in that case.  *Id.* at 164.

Third, *Davis* tries Pennsylvania.  *Davis*, 776 So. 2d at 974 (citing *Weinberg v. Sun Co.*, 740 A.2d 1152 (Pa. Super. Ct. 1999)).  But again, after *Davis*, the Supreme Court of Pennsylvania reversed the *Weinberg* court in part, holding that the state consumer protection statute "clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action. That means . . . a plaintiff must allege reliance."  *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) (emphasis in original).

Fourth and finally, *Davis* points to Michigan's objective test. *Davis*, 776 So. 2d at 974 (citing *Dix v. Am. Bankers Life Assurance Co. of Fla.*, 415 N.W.2d 206 (Mich. 1987)).  Admittedly, *Dix* has not been overturned and directly states, "We hold that members of a class proceeding under the [Michigan] Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations."  *Dix*, 415 N.W.2d at 209 (footnote omitted).  Not only is *Dix* in no way binding on either this Circuit or the Florida courts, but its reasoning implicates all the constitutional concerns discussed in part III, *supra*.  Further, the *Dix* holding resides in a discussion of the "convenient administration of justice" prong of a Michigan class action, after incredibly brief mentions of common questions of law and fact and common relief, as well as no discussion of due process concerns for the defendant. *Dix*, 415 N.W.2d at 209.  Therefore, the Michigan high court's

reasoning ought to have no influence on our discussion here.  As the United States Supreme Court has often stated, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."  *TransUnion*, 141 S. Ct. at 2207 (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 944, 103 S. Ct. 2764, 2781 (1983)).

3.

While *Davis* recognizes that "the 'likely to mislead' standard was developed for use with the Federal Trade Commission Act, which has no provision for a suit by a private citizen," it still adopts the test, absent more specific guidance about the interpretative clause of the FDUTPA.  *Davis*, 776 So. 2d at 974.  This was erroneous.  And because the *Davis* court explicitly looked to federal law to interpret Florida law, this issue falls within our bailiwick and we need not blindly follow this Florida court's holding.  Hopefully, the preceding analysis shows that *Davis* is a thin reed to lean on, the *Davis* court misinterpreted the FTC Act, and we should not have relied on that case to interpret the FDUTPA in this Court.  Again, I call on the court en banc to address our erroneous cases that adopt Florida's supposed objective test and correct the case law in this Circuit.  Let us now examine the Eleventh Circuit cases that seem to adopt the objective test and determine whether or not they can stand.

In *Zlotnick v. Premier Sales Group, Inc.*, a plaintiff appealed the dismissal for failure to state a claim of his class action complaint

alleging FDUTPA violations against real estate companies for "market[ing a] condominium complex, solicit[ing] deceptive reservation agreements to secure financing and then terminat[ing] the reservation agreements with the sole purpose of reaping the benefits of a rising real estate market." 480 F.3d 1281, 1283–84 (11th Cir. 2007). The *Zlotnick* court adopted the objective test from *Millennium Commc'ns*—which we have already seen is inapposite to a damages claim—rather than from *Davis. Id.* at 1284 (citing 761 So. 2d at 1263). The erroneous reading of Florida law did not negatively impact the outcome, however, because the Court found Zlotnick failed to state a claim even under the objective test. *Id.* at 1287.

In *Fitzpatrick v. General Mills, Inc.*, this Court considered an interlocutory appeal of class certification. *635 F.3d 1279, 1280* (11th Cir. 2011). The plaintiffs in that case claimed to have been duped by General Mills's advertisements touting the digestive health benefits of YoPlus yogurt and filed a FDUTPA claim. *Id.* at 1281. While remanding for a new definition of the class, this Court agreed with the District Court and praised its analysis that concluded the class members did not need to individually prove reliance, specifically that they purchased YoPlus "to obtain its claimed digestive health benefits." *Id.* at 1282–83. In reaching this conclusion, the Court cited the objective test prescribed by *Davis* as well as in another Florida state court case. *Id.* (citing *Davis*, 776 So. 2d at 973 and *State, Off. of Att'y Gen. v. Com. Com. Leasing*, 946 So. 2d 1253, 1258 (Fla. 1st Dist. Ct. App. 2007)). We have already discussed *Davis* at length. But *Com. Com. Leasing* serves as a bad guide

as well.  That case involved the Florida Attorney General suing to enforce the FDUTPA, not a class action under the FDUTPA.  *Com. Com. Leasing*, 946 So. 2d at 1255.  Therefore, the en banc Court should overturn *Fitzpatrick* as erroneously adopting the objective test for the FDUTPA.

In *Carriuolo v. General Motors Co.*, this Court considered an interlocutory appeal of class certification.  823 F.3d 977, 980–81 (11th Cir. 2016).  The nub of the claim in that case was that the National Highway Traffic Safety Administration had not yet assigned safety ratings to the 2014 Cadillac CTS sedan, despite the cars being sold with a sticker touting its five-star rating on certain features.  *Id.* at 981–82.  General Motors argued that common issues did not predominate because "some class members may have known that the safety ratings were inaccurate; some may not have been aware of the Monroney sticker; and each member negotiated the purchase or lease price individually with the dealer from whom the member purchased or leased the vehicle."  *Id.* at 985.  But this Court relevantly held that the District Court did not abuse its discretion in certifying the plaintiff class for the FDUTPA claim because *Davis* instructs that plaintiffs do not need to show actual reliance.  *Id.* at 985, 990 (citing *Davis*, 776 So. 2d at 973).  *Carriuolo* also looks to *Com. Com. Leasing*, and *Fitzpatrick*.  As already discussed, all three of these cases led the *Carriuolo* court astray, and the en banc Court ought to overturn *Carriuolo* as well.

In *Debernardis v. IQ Formulations, LLC*, plaintiffs appealed the dismissal of their complaint on grounds that they lacked standing.

942 F.3d 1076, 1080 (11th Cir. 2019).  The complaint sought class action certification and alleged that the defendants sold dietary supplements that were "adulterated" as defined by the Federal Food, Drug, and Cosmetic Act.  *Id.* at 1081–82.  We remanded that case, *id.* at 1089, finding standing because the plaintiffs alleged that they "would not have purchased" the supplements "had they known that sale of the supplements was banned," thus eliminating "the entire benefit of their bargain," and establishing economic loss standing.  *Id.* at 1088.  The *Debernardis* opinion cites *Carriuolo* for the benefit-of-the-bargain theory under the FDUTPA.  *Id.* at 1084 (citing 823 F.3d at 986–87).  While *Carriuolo* did not in itself taint *Debernardis*, and thus, the case likely need not be addressed en banc, I again warn against utilizing the benefit-of-the-bargain theory in misrepresentation cases involving negotiated products.  *See supra* part V.B.

The plaintiff in *Marrache v. Bacardi U.S.A., Inc.* filed a putative class action against Bacardi and Winn-Dixie asserting, relevantly, a FDUTPA claim that defendants "adulterat[ed] Bombay [Sapphire Gin] with grains of paradise."  17 F.4th 1084, 1089–90 (11th Cir. 2021).  The District Court dismissed the amended complaint, and we affirmed.  *Id.*  This Court affirmed the dismissal "because Marrache's FDUTPA claims fall under FDUTPA's safe harbor provision," and in the alternative "because Marrache failed to state a plausible claim for actual damages under FDUTPA."  *Id.* at 1101.  Though *Marrache* takes the objective test from *Carriuolo* and *Zlotnick*, *id.* at 1097–98, the erroneous reading of the FDUTPA did not negatively impact this decision, as the Court ultimately concluded

none of the class members alleged actual damages. *Id.* at 1101. Therefore, *Marrache* also likely need not be addressed en banc.

4.

I take a moment now to discuss another Florida District Court of Appeal case cited in *Carriuolo*, *Debernardis*, and *Marrache* for the benefit-of-the-bargain theory under FDUTPA: *Rollins, Inc. v. Heller*, 454 So. 2d 580 (Fla. 3d Dist. Ct. App. 1984). *Heller* was an appeal of a final judgment awarding the plaintiffs damages on their claims for gross negligence and deceptive and unfair trade practices. *Id.* at 582. The claims arose out of the installation of an alarm system by defendant and the subsequent burglary of the plaintiffs' home. *Id.* This case was not a class action. While that distinction itself makes the case less relevant in the class action context, there are two other reasons our Court's use of *Heller* in *Carriulo*, *Marrache*, and *Debernardis* perhaps merited more reasoning before application.

First, the benefit-of-the-bargain damages measurement *Heller* adopted from Texas (and for which our Court cites *Heller*), was used to limit, the plaintiff's damages in *Heller* itself. *Id.* at 585–86. The Hellers originally won damages for the property stolen during the burglary, but the District Court of Appeal limited the FDUTPA damages to "the difference in the market value of the [alarm system] in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Id.* at 585 (citation omitted). Absent other Florida courts independently adopting the test, we should

22-10575   TJOFLAT, J., Concurring and Dissenting in Part          61

hesitate before leaning too heavily on this case to *expand* liability and damages in the class action context.  Second, before adopting the Texas test for damages, the *Heller* court recognized erroneously that the Florida "legislature specifically provided that great weight was to be given to the federal courts' interpretations of the Federal Trade Commission Act." *Id.* at 584.  Of course, this is only erroneous because *Heller* involved a FDUTPA damages claim, *see supra* V.D.1, not an injunctive FDUTPA claim.

5.

Before signing off, I also would like to point out that a Florida state court has recognized the dangers of rolling over due process rights in the interest of class action efficiency.

In *Rollins Inc. v. Butland*, plaintiffs filed a class action complaint in part under the FDUTPA, alleging violations "arising from Orkin's contractual undertakings related to the control of subterranean termites." 951 So. 2d 860, 865 (Fla. 2d Dist. Ct. App. 2006). Plaintiffs sought actual damages for payments made to Orkin as well as property damage caused by subterranean termites. *Id.* at 866.  "[M]embership in the proposed class was not limited to customers who sustained damage to their residences as a result of an infestation of subterranean termites," but members who did not suffer damages were limited to the actual damages from payments to Orkin. *Id.*  The District Court of Appeal reversed class certification, *id.* at 882, specifically finding that individual questions predominated both to prove the deceptive acts and unfair practices

themselves (prong one of the FDUTPA), *id.* at 871, and to prove causation and damages.  *Id.* at 873.

The court lucidly stated the following regarding the trial court's attempt to utilize the class-wide proof for this complex contract case alleging fourteen separate deceptive acts, *id.* at 870:

> In a case such as this, authorizing class-wide proof to be made based on alleged company-wide pervasive schemes and business practices is not only inconsistent with established Florida precedent, but it also has the potential to deny the Appellants substantive due process of law.  Under the substantive law applicable to the FDUTPA damages claim, each member of the putative class must establish that the Appellants committed a deceptive act or unfair practice that caused their actual loss.  Under the circumstances present here, collective proof cannot satisfy the class members' burden.  However, if the Appellees are permitted to establish the putative class members' claims by proof of common schemes or patterns of behavior, the Appellants will be unable to defend against individual claims where there may be no liability.  By any standard, this would amount to a violation of substantive due process of law.

*Id.* at 873–74.

## VI.

In sum, I concur in the Majority's handling of the Texas statutory class, the Washington, New York, and Tennessee common law classes, and the California and Texas implied warranty classes.

22-10575    Tjoflat, J., Concurring and Dissenting in Part    63

I dissent with respect to the Majority's position on the Florida, California, Missouri, New York, and Washington statutory classes and the California common law class. Rather than affirming them, I would have held the District Court abused its discretion when it certified those classes.